Tom P. McCoy et al., *Respondents*, v. Kent Nursery, Inc.,
et al., *Appellants*.

*Joseph M. Diaz and Rebecca Larson* (of *Davies Pearson PC*); *Albert E. Hammermaster* and *David C. Hammermaster* (of *Hammermaster Law Offices PLLC*); *James E. Macpherson* (of *Kopta & Macpherson*), for appellants Kent Nursery Inc., the Mauritsens, the Fenimores, and Fir Run Nursery LLC.

748

*Mark E. Lindquist, Prosecuting Attorney,* and *Ronald L. Williams* and *John F. Salmon III, Deputies,* for appellant Pierce County Public Works and Utilities.

*Sarah L. Lee* (of *Krafchick Law Firm*); *David Gross* and *Colette M. Kostelec* (of *Helsell Fetterman LLP*); and *Carolyn A. Lake* (of *Goodstein Law Group PLLC*), for respondents.

¶1 VAN DEREN, J. — Kent Nursery Inc.; Steven, "Jane Doe," Richard, and Phyllis Mauritsen; Fir Run Nursery LLC; Stanley Michael and Gayla Fenimore;[1] and Pierce County Public Works and Utilities appeal from the trial court's orders (1) granting plaintiffs Tom and Kathleen McCoy a new trial, following a 16 day jury trial that resulted in a unanimous defense verdict and (2) denying the Nurseries' and Pierce County's motion for reconsideration. The Nurseries and Pierce County argue that the trial court abused its discretion when it ordered a new trial based on juror misconduct, and the Nurseries argue substantial evidence supported the jury's verdict. We agree, reverse the trial court's order granting a new trial, and remand for entry of the jury's verdict. We also grant costs on appeal to Kent Nursery and Fir Run Nursery, but we deny their requests for attorney fees.

## FACTS

¶2 The McCoys filed suit against the Nurseries and Pierce County for damage caused by the failure of a clay tile pipe drainage system that runs under the Nurseries' prop-

---

[1] We refer collectively to Kent Nursery Inc.; Steven, "Jane Doe," Richard, and Phyllis Mauritsen; Fir Run Nursery LLC; and Stanley Michael and Gayla Fenimore as the "Nurseries" for clarity.

erty to a catch basin in a Pierce County right-of-way area and west under a road to the McCoy's property, ultimately discharging into Horse Haven Creek through the submerged end of the pipe. The pipe drainage system drains excess groundwater from the Nurseries' property, and an opening in the catch basin allows runoff water from the street to enter the drainage system.

¶3 According to Harold Louderback, former owner of the Nurseries' property, underground drainage pipes serving the Nurseries' property crossed the road and drained into a "slew"[2] on the property west of the street as early as 1961. 8 Report of Proceedings (RP) at 898. John Westby then owned the land west of Louderback's that included the property the McCoys now own. In 1965, with Westby's permission Louderback replaced some of the clay tile drainage pipe on Westby's property with higher-volume pipe. Louderback also dug an open ditch running to Horse Haven Creek on Westby's property as a new outlet for the drainage system. He did so partially because Westby wanted to drain the slough and because Westby's farmland was "quite wet" at the time. 8 RP at 941-42.

¶4 Sometime after 1967, Louderback helped Harold Hahn, who then owned the western property that included the property the McCoys now own, expand the drainage system on the Hahn property, extending it so that it drained directly into Horse Haven Creek; and Louderback allowed the earlier ditch he dug to be filled. Louderback also helped Hahn replace a pipe that had been crushed by cement trucks Hahn used in constructing a barn and garage on the property.

---

[2] According to William Creveling, an expert witness for the McCoys, "slew" (or "slough," which we use hereafter) is likely a synonym for "swale." 8 Report of Proceedings (RP) at 847. A "swale" is "not necessarily a well-formed channel, but some place that intermittent [water] flow can go to." 10 RP at 1236.

¶5 In 1990, Kent Nursery purchased Louderback's property.[3] In approximately 1993, Rolland Hartstrom Jr., purchased the western property that included the property the McCoys now own from Harold and Esther Hahn and subdivided it into four parcels. In 1995, Hartstrom sold the McCoys lot 4, the parcel containing the Hahns' former house and garage. 4 RP at 264.

¶6 In late 1995, Hartstrom discovered water "bubbling" out of the ground on lot 3 of his subdivided parcels. 3 RP at 229. In late 1995 or early 1996, Hartstrom sued the Hahns for failing to disclose the drainage pipe system running under the four parcels. The lawsuit ultimately resulted in the Hahns' repurchasing lot 3 from Hartstrom in 1997, subject to a "permissive use agreement,"[4] which Hartstrom recorded against lot 3. 3 RP at 221. Hartstrom described the permissive use agreement as a "license for permissive use" granting Kent Nursery "permission for use and maintenance of existing storm water drainage pipe running under . . . Kent Nursery property and passing through [lot 3]." 3 RP at 240-41. But the permissive use agreement bore only Hartstrom's and his wife's signatures, and it contained no affirmation or agreement to its terms by Kent Nursery or its agents. Hartstrom also admitted that he never sent a copy of the agreement to Kent Nursery or its agents.

¶7 In 1998, the McCoys purchased lot 3 from Esther Hahn. Before purchasing lot 3, the McCoys performed a title search, discovered the permissive use agreement, and became aware of the drainage system running under the parcel. As part of their purchase, the McCoys executed a "hold harmless agreement," releasing Esther Hahn from liability for any damage resulting from the drainage system under lot 3. 5 RP at 498-99. In executing the hold harmless agreement, Tom McCoy was aware that the drainage pipes ran under both lots 3 and 4.

---

[3] In June 2006, Fir Run Nursery purchased 20 acres of Kent Nursery's property.

[4] This agreement was plaintiffs' exhibit 1 at trial. It does not appear in the record on appeal.

¶8 In 2004, Tom McCoy drove a backhoe over lot 3 to "knock[ ] down some sticker bushes." 5 RP at 506. In early 2006, the McCoys first noticed water bubbling up out of two or three sinkholes on lot 3 and water flooding their property from across the street. The flood waters flowed out of the catch basin, crested the road, and flowed westward across their property. Because the flooding recurred, the McCoys used a backhoe to build a dirt "berm" on their property, intending to divert the water. 4 RP at 272. The McCoys also used "several dump truck loads of fill dirt" to fill in the sinkholes, despite seeing drainage pipes in the holes, because they believed that the pipes were broken; but they did not examine them or attempt to replace them. 5 RP at 466. After the McCoys filled the sinkholes on lot 3, the sinkholes on their property spread to lot 4, multiplied, and worsened.

¶9 In early 2009, the McCoys sued the Nurseries and Pierce County; the Nurseries counterclaimed against the McCoys. The parties waived conducting voir dire on the record.

¶10 William Creveling, a geologist and the McCoys' expert witness, opined that neither the heavy machinery on the McCoys' property nor the weight of the structures built on the property damaged the drainage pipes because of the pipes' depth and the soil's load bearing capacity. He also opined that because the terminal point of the drainage system was submerged in Horse Haven Creek, backflow from the creek partially flooded a section of the pipes and contributed to the system's failure. He further opined that the drainage system did not remove groundwater from the McCoys' property. Finally, he opined that the drainage pipes collapsed because of the "tremendous amount of water leaving" the Nurseries through the system. 7 RP at 763.

¶11 Damon DeRosa, an engineer and another expert witness for the McCoys, stated that the maintenance work

Pierce County performed, including "jet-rodding"[5] the catch basin and clay pipes, further damaged and increased the amount of water entering the system. He stated that he would never recommend "jet-rodding" clay tile pipe.

¶12 Dennis Dixon, a Pierce County Surface Water Management Division engineer and drainage analyst, was an expert witness for Pierce County. He informed the jury that as early as 1931, surface water followed a natural drainage course through a swale moving westward across the McCoys' property into Horse Haven Creek. He also opined that without the drainage system, surface water would naturally follow this same route through the McCoys' property.

¶13 Owen Reese, a civil engineer, hydrologist, and expert witness for the Nurseries, opined that the drainage system served to remove excess groundwater from the McCoys' property. He also stated that the drainage system on the McCoys' property follows portions of the swale's natural drainage course. He concluded that a blockage in the drainage pipes downstream from the catch basin was causing water to flow out of the catch basin. He also opined that filling a sinkhole containing a defective pipe could block the drainage system and cause sinkholes upstream from the blockage.

¶14 Both Steven Mauritsen, president of Kent Nursery, and Stanley Michael Fenimore, manager of Fir Run Nursery, confirmed that water from their properties enters the McCoys' property through the broken drainage system. They also said that due to the broken drainage system and the McCoys' berm, the water flowing from the catch basin collected and deepened until it flooded the Nurseries' property, killing their trees and making portions of the land unusable for their businesses.

---

[5] According to David Andrew Greatwood, an employee of the Road Operations Division of Pierce County Public Works, "jet-rodding" involves inserting a hose with an attachment at its "head" into a pipe. The attachment sprays high-pressure water backward, simultaneously propelling the hose forward and any accumulated silt or debris backward to an awaiting vacuum.

¶15 The McCoys did not object to any of the trial court's jury instructions.[6] The jury returned a special verdict finding that the Nurseries and Pierce County were not negligent and that the Nurseries had not trespassed on the McCoys' property. It also found that the McCoys were negligent and that their negligence proximately caused their own damages and the Nurseries' damages, and it awarded damages to the Nurseries. Finally, it also found

---

[6] Jury instruction 7, the negligence instruction, provided:

> Negligence is the failure to exercise ordinary care. It is the doing of some act that a reasonably careful person would not do under the same or similar circumstances or the failure to do some act that a reasonably careful person would have done under the same or similar circumstances.

Clerk's Papers (CP) at 552. Jury instruction 8 provided, "Ordinary care means the care a reasonably careful person would exercise under the same or similar circumstances." CP at 553. Jury instruction 13 provided, "The term 'proximate cause' means a cause in which a direct sequence unbroken by any superseding cause, produces the event complained of and without which such event would not have happened." CP at 558.

Jury instruction 21, the trespass instruction, provided, "An intentional or negligent intrusion onto the property of another that interferes with the other's right to exclusive possession is a trespass." CP at 567. Jury instruction 23 provided:

> In order to prove a trespass, the plaintiff has the burden of proving each of the following propositions:
>
> First, that one or more of the defendants caused water to be channeled upon plaintiffs' land in ways different than such waters would naturally flow;
>
> . . . .
>
> Fourth, as a direct and proximate result of the defendants' acts or failure to act, the plaintiffs suffered actual and substantial damages.
>
> A trespass may be committed either negligently or intentionally.

CP at 569. Jury instruction 24 provided, "You are instructed that a negligent intrusion occurs 'where the actor does not use reasonable care to prevent the exercise of his privilege from involving an unreasonable risk of harm to the legally protected interests of others.'" CP at 570 (citation omitted).

Jury instruction 26 provided:

> The common enemy doctrine allows landowners to dispose of unwanted surface and ground water [sic] in any way they see fit, without liability for resulting damage to one's neighbor, except where a landowner has:
>
> (1) blocked a natural watercourse or natural drain and/or;
>
> (2) artificially collected surface or ground waters [sic] in quantities greater than or in a manner different than the natural flow and discharged on neighboring property and/or;
>
> (3) failed to use due care when altering the flow of surface or groundwater.

CP at 572.

that Tom McCoy's trespass on the Nurseries' property had proximately caused their damages.

¶16 The McCoys filed a motion for judgment notwithstanding the verdict under CR 50 and a motion for a new trial under CR 59. Their CR 59 motion asserted that the jury's verdict was "contrary to the great weight of th[e] evidence" and that two jurors committed misconduct that entitled them to a new trial. Clerk's Papers (CP) at 136. The McCoys' counsel filed a declaration supporting the motions. According to counsel,

> [Juror 2] stated during the post-trial interview that her home was damaged as a result of the clay tile system on her property and flooding and that she personally incurred costs for the repair of her home as a result of the clay tile, flooding, and wetland issues on her property. These facts were not provided by [juror 2] when questioned during voir dire.

CP at 155. Counsel also alleged that in the postverdict discussion, juror 2 "stated that she thought [the McCoys] should have taken ownership of [their] property and paid for [their] home damages as she had done, and that [the McCoys] didn't take responsibility for the damage occurring on [their] property." CP at 155. Finally, the McCoys' counsel alleged that during the postverdict interview,

> juror number 11 ... disclosed that according to his professional experience with replacing broken pipe when the ground gets wet and soggy, any type of heavy equipment would crush clay tile pipes buried beneath "like eggshells". [Juror 11] did not disclose this information during voir dire.

CP at 155 (citation omitted).

¶17 Counsel for the Nurseries and Pierce County responded with declarations generally stating that (1) juror 2 "identified some experience with wetlands and water on her own property" during voir dire and fully answered the questions posed to her, and "[n]one of the attorneys made further inquiry"; (2) the McCoys' counsel never asked any questions about "structural damage caused by water" dur-

ing voir dire; (3) juror 2 never stated during the posttrial interview that she had a clay tile drain on her property; (4) juror 11 answered numerous questions about his background as a grounds maintenance supervisor and advised of his decades of experience with "water drainage issues," replacing pipes, and operating heavy equipment; and (5) the McCoys' counsel did not ask questions during voir dire about "clay tile pipe being damaged by heavy equipment." CP at 164.

¶18 The McCoys filed a reply declaration from juror 10, who stated:

> [Juror 2] discussed some of her own problems with [Pierce] County when she was getting permits for her house. During deliberations she discussed her experience with the County and compared her problems to what was going on in the case. After deliberation, she stated that she and her husband took ownership and fixed their problems and did not go after the County even though they could have. [Juror 2] said that she used to sell real estate and based upon that, she informed the jurors that a document is not legal unless it has two signatures on it. Therefore, she argued that the Permissive Use Agreement was not valid because there was only one signature.

CP at 194. Juror 10 also stated:

> When we were deliberating we asked [juror 11] what his experience was with certain things[,] i.e.[,] the use of clay pipes and jet rodding. . . . During juror selection, [juror 11] admitted to working with pipe through his job in Kansas. During deliberations he was asked what he thought of the jet rodding on the clay pipe and if he believed it had an effect on it. [Juror 11] stated that in his experience, jet rodding did not harm the clay pipe or undermine the soil.

CP at 194. Pierce County filed another declaration stating that juror 2 had disclosed her experience as a realtor during voir dire. The trial court did not conduct any fact-finding about the McCoys' allegations of juror misconduct or whether juror 2 had any clay piping on her property.

¶19 Following a hearing on the McCoys' motions, the trial court denied their CR 50 motion, but it granted the CR 59 motion. It entered written findings of fact stating that (1) juror 2 failed to disclose in voir dire damage to her home from flooding from old drainage pipes and that she "took ownership and paid for the damage to the home despite feeling Pierce County was responsible"; (2) juror 2 failed to disclose her "prior specialized real estate experience"; (3) juror 11 failed to disclose his "prior specialized experience" with "jet-rodding" clay tile pipes; (4) juror 11 failed to disclose his "prior specialized experience" with weight displacement and the effect of heavy equipment travelling over buried clay tile pipe; (5) juror 2 interjected extrinsic evidence into jury deliberations by relating her real estate experience and her experience with drainage pipes damaging her home; (6) juror 11 interjected extrinsic evidence into jury deliberations because of his experience with "jet-rodding," weight displacement, and the effect of heavy equipment on clay tile pipes; (7) juror 10's declaration confirmed juror 2's interjection of extrinsic evidence; (8) juror 10's declaration confirmed juror 11's interjection of extrinsic evidence; (9) the "great weight of evidence at trial established water trespass" by the Nurseries because they admitted their water entered the McCoys' property without permission and they did not make efforts to block their water; and (10) "[t]he jury's verdict shocked the conscience of the court and shocked all the litigants including defendants' counsel."[7] CP at 247-49. Its conclusions of law stated that (1) juror 2's and juror 11's failures to disclose would have provided a basis for a "for cause" challenge; (2) the interjection of this extrinsic evidence into jury deliberations could have affected the verdict; and (3) a new trial was warranted under CR 59(a)(1), CR 59(a)(3), CR 59(a)(5), CR 59(a)(6), and CR 59(a)(9) because the verdict was contrary

---

[7] At a hearing for entry of the trial court's findings and conclusions, several attorneys for the defendants objected to finding 10, maintaining that neither they nor their clients were shocked by the jury's verdict.

to the "great weight of evidence presented during trial" establishing water trespass by the Nurseries. CP at 250-51.

¶20 The Nurseries and Pierce County filed a motion for reconsideration supported by affidavits from 10 of the jurors. These declarations generally indicated that juror 2 and juror 11 had disclosed their respective backgrounds and experiences during voir dire and stated that the jury's verdict was based solely on the evidence adduced at trial. Juror 2's declaration stated that she had at no time had any clay tile pipes or "tile issues" on her property, that she had disclosed during voir dire that she had 12 years' experience as a realtor, and that she had disclosed during voir dire that she had grown up on her grandfather's Oregon farm, which contained a clay tile pipe drainage system. CP at 287. Juror 11's declaration stated that he had disclosed during voir dire that he had replaced broken clay tile pipes many times and that there were no questions about "jet-rodding" during voir dire. The trial court denied the motion for reconsideration. The Nurseries and Pierce County appeal.

## ANALYSIS

¶21 The Nurseries and Pierce County contend that the trial court abused its discretion in ordering a new trial based on juror misconduct and in denying their subsequent motion for reconsideration. They argue that (1) the McCoys' counsel's declaration did not demonstrate that jurors 2 and 11 failed to honestly answer material questions during voir dire and did not show that correct responses would have provided a valid basis for a challenge for cause and (2) the trial court improperly relied on juror 10's declaration discussing juror deliberations. We agree.

I. STANDARD OF REVIEW

¶22 We normally review the trial court's grant or denial of a motion for a new trial based on juror misconduct for abuse of discretion. *Robinson v. Safeway Stores, Inc.*, 113

Wn.2d 154, 158, 776 P.2d 676 (1989). We also review a trial court's admission of evidence for abuse of discretion, *City of Spokane v. Neff*, 152 Wn.2d 85, 91, 93 P.3d 158 (2004), and we review a trial court's denial of a motion for reconsideration for abuse of discretion. *Brinnon Grp. v. Jefferson County*, 159 Wn. App. 446, 485, 245 P.3d 789 (2011).

¶23 A trial court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010). "A discretionary decision 'is based on untenable grounds' or made 'for untenable reasons' if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." *State v. Quismundo*, 164 Wn.2d 499, 504, 192 P.3d 342 (2008) (emphasis omitted) (internal quotation marks omitted) (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

 ¶24 The Nurseries and Pierce County challenge all of the trial court's findings of fact and conclusions of law in granting the motion for a new trial. We review findings of fact to determine whether substantial evidence supports them. *Soltero v. Wimer*, 159 Wn.2d 428, 433, 150 P.3d 552 (2007). "Substantial evidence is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premise." *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978). We review the trial court's conclusions of law de novo. *Soltero*, 159 Wn.2d at 433.

## II. Juror Misconduct

¶25 The Nurseries and Pierce County argue that the trial court abused its discretion (1) in finding that jurors 2 and 11 withheld information during voir dire that would have provided a challenge for cause, and interjected withheld extrinsic evidence into jury deliberations and (2) in admitting and considering juror 10's declaration because it discussed juror deliberations and matters that inhere in the verdict. We agree.

¶26 Once a trial court has determined the existence of juror misconduct, we give great deference to the trial court's determination of whether juror misconduct affected the verdict because the trial court "observed all the witnesses and the trial proceedings and had in mind the evidence which had been presented." *Halverson v. Anderson*, 82 Wn.2d 746, 752, 513 P.2d 827 (1973). In considering the McCoys' request for a new trial based on juror misconduct, the trial court did not engage in fact-finding with the accused jurors; it made no written or oral findings of its recollection of voir dire or of credibility or weight accorded the competing declarations to which we can defer. And no record of voir dire exists. Thus, the posttrial affidavits of counsel and jurors and other documentary evidence before us on appeal comprise the basis of the trial court's findings on juror misconduct and the effect on the verdict that we review on appeal. In general, "appellate courts are in as good a position as trial courts to review written submissions" and may review de novo trial court decisions based on affidavits and other documentary evidence.[8] *In re Marriage of Rideout*, 150 Wn.2d 337, 350, 77 P.3d 1174 (2003).

¶27 We analyze whether a juror's statements inhere in the verdict separately from whether a juror committed misconduct by withholding information during voir dire that the juror later introduced as extrinsic evi-

---

[8] Here, the threshold issue is whether posttrial declarations supporting a motion for a new trial adequately demonstrate juror misconduct. Based on the lack of supporting evidence in the record, we hold that the trial court abused its discretion in finding that jurors 2 and 11 withheld information during voir dire and that they interjected withheld information during deliberations; therefore, we do not reach whether the alleged misconduct affected the verdict, and we do not defer to the trial court's knowledge of the proceedings—information outside the record and available only to the trial court in ordering a new trial. *See Allison v. Dep't of Labor & Indus.*, 66 Wn.2d 263, 265, 401 P.2d 982 (1965) (reversing the trial court's denial of a motion for a new trial based on concealed juror bias without analyzing the bias's effect on the verdict); *State v. Johnson*, 137 Wn. App. 862, 869-70, 155 P.3d 183 (2007) (stating that we analyze whether the interjection of extrinsic evidence affected the verdict); *see also Kuhn v. Schnall*, 155 Wn. App. 560, 575, 228 P.3d 828 (stating, "whether bias actually affected the verdict is not the question"), *review denied*, 169 Wn.2d 1024 (2010); *Dalton v. State*, 115 Wn. App. 703, 713, 715, 63 P.3d 847 (2003) (stating the same).

dence during deliberations. *See Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197, 204 n.12, 75 P.3d 944 (2003). " 'A trong, affirmative showing of misconduct is necessary in order to overcome the policy favoring stable and certain verdicts and the secret, frank and free discussion of the evidence by the jury.' " *Breckenridge*, 150 Wn.2d at 203 (quoting *State v. Balisok*, 123 Wn.2d 114, 117-18, 866 P.2d 631 (1994)).

A. Alleged Failure To Disclose During Voir Dire

¶28 This case presents a cautionary tale of the risks parties and counsel take when waiving a court reporter's services during voir dire in civil cases. The McCoys' counsel supported the motion for a new trial based on juror misconduct with a declaration reciting her recalled—but disputed—exchanges with jurors 2 and 11 during postverdict conversations, claiming that these two jurors failed to disclose information during voir dire that she later learned during the postverdict discussion.[9]

¶29 A juror's misrepresentation or failure to speak regarding a material fact when called on during voir dire can constitute juror misconduct:

> "[W]hen there is strong evidence to the effect that a juror was biased *when he entered upon the case* and swore falsely on *voir dire*, concealing his bias, the trial court will not abuse its discretion in granting a motion for new trial. The misconduct consists of his deception of the court and counsel as to his incompetence as an impartial juror."

---

[9] The Nurseries and Pierce County maintain that the trial court erred in relying on the McCoys' counsel's hearsay declaration concerning juror statements made at the posttrial interview. But as Division Three of this court has observed, in Washington juror misconduct cases, "affidavits containing hearsay statements of the juror in question were the means by which [the misconduct] was brought to the court's attention." *Dalton*, 115 Wn. App. at 716 (citing *Robinson*, 113 Wn.2d at 156; *State v. Cho*, 108 Wn. App. 315, 329, 30 P.3d 496 (2001); *Allyn v. Boe*, 87 Wn. App. 722, 728, 943 P.2d 364 (1997)). In *Dalton*, Division Three concluded that the trial court erred in not considering the hearsay affidavit of a store employee who heard pretrial statements of an eventual juror evidencing bias. 115 Wn. App. at 708-09, 716. The trial court here properly considered the McCoys' counsel's hearsay declaration, as counsel was in a position to hear statements made by the jurors during the posttrial interview.

*Robinson*, 113 Wn.2d at 158 (alteration in original) (quoting *Nelson v. Placanica*, 33 Wn.2d 523, 528-29, 206 P.2d 296 (1949)). The party seeking a new trial must show that a juror "failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555-56, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984) (italics omitted); *see also In re Pers. Restraint of Elmore*, 162 Wn.2d 236, 267, 172 P.3d 335 (2007) (stating the same).

¶30 A juror who brings information outside the record to the jury deliberations also commits misconduct. *Richards v. Overlake Hosp. Med. Ctr.*, 59 Wn. App. 266, 270, 796 P.2d 737 (1990); *see also Halverson*, 82 Wn.2d at 752. But whether a juror's interjection of specialized knowledge "outside the realm of a typical juror's general life experience" into deliberations constitutes prejudicial misconduct depends on the questions asked during voir dire; a juror does not commit misconduct by bringing knowledge and experiences known to the parties into deliberations. *Richards*, 59 Wn. App. at 274 (juror did not commit misconduct by applying specialized "medical" knowledge during deliberations when background was disclosed during voir dire).

¶31 Based on her recollection of postverdict conversations with jurors 2 and 11, the McCoys' counsel asked the trial court to find that jurors 2 and 11 withheld information during voir dire. Specifically, according to the McCoys' counsel:

> [Juror 2] stated during the post-trial interview that her home was damaged as a result of the clay tile system on her property and flooding and that she personally incurred costs for the repair of her home as a result of the clay tile, flooding, and wetland issues on her property. These facts were not provided by [juror 2] when questioned during voir dire.[10]

---

[10] Juror 2 filed a responsive declaration denying the existence of clay tile pipes on her property.

CP at 155. Another claimed basis of juror misconduct by the McCoys' counsel was that after the verdict, juror 2 "stated that she thought [the McCoys] should have taken owner-ship of [their] property and paid for [their] home damages as she had done, and that [the McCoys] didn't take respon-sibility for the damage occurring on [their] property." CP at 155. The McCoys' counsel also alleged that during the postverdict interview,

> juror number 11 . . . disclosed that according to his professional experience with replacing broken pipe when the ground gets wet and soggy, any type of heavy equipment would crush clay tile pipes buried beneath "like eggshells". [Juror 11] did not disclose this information during voir dire.

CP at 155 (citation omitted).

¶32 Although the McCoys assert that jurors 2 and 11 withheld information during voir dire, the McCoys' coun-sel's declaration did not indicate that the voir dire questions she directed to these jurors would have elicited the claimed omitted answers, or information, or additional information that would have led to a challenge for cause.[11] And, when questioned about the absence of this information on appeal, the McCoys' counsel suggested only that a general question about experience with flooding was posed during voir dire; and counsel could not point to any place in the record where a specific question asked of either juror 2 or juror 11 was not fully answered. Moreover, counsel's declaration does not suggest that juror 2 or juror 11 interjected extrinsic infor-mation during deliberations.

¶33 Our Supreme Court's analysis in *Breckenridge* is helpful. *Breckenridge* was a medical malpractice case in which the plaintiff moved for a new trial, arguing, based on the declaration of a juror, Temple, that another juror, Corson, committed misconduct by introducing extrinsic evidence about his wife's emergency room experiences into

---

[11] Defense counsels assert that jurors 2 and 11 revealed the contested informa-tion during voir dire.

jury deliberations. 150 Wn.2d at 199, 201-02. Our Supreme Court noted that there were no allegations that juror Corson answered questions untruthfully during voir dire. *Breckenridge*, 150 Wn.2d at 201 n.7. But it also noted that although voir dire was not reported, defense counsel's declarations and the trial court's recollections sufficiently indicated that Corson was asked about his wife's symptoms, emergency room visits, and treatment and that he disclosed this information during voir dire. *Breckenridge*, 150 Wn.2d at 201 n.6.

¶34 As in *Breckenridge*, voir dire was not reported here. Unlike *Breckenridge*, however, the McCoys and their counsel failed to point to what questions went unanswered by jurors 2 and 11; and, in the absence of reported voir dire, the record does not indicate any of the questions asked or any of the answers given during voir dire. The McCoys' counsel offers a copy of her notes taken during voir dire to support her argument, but the notes are largely unintelligible. The intelligible portions of the notes consist of the words "wetland" and "tightline" and do not reflect specific questions directed to jurors 2 and 11 during voir dire or the entirety of any juror's responses. CP at 831.

¶35 Declarations filed by other counsel and jurors[12] counter the McCoys' counsel's assertions and indicate that juror 2 and juror 11 generally disclosed their respective backgrounds and, implicitly, their knowledge, including juror 2's real estate knowledge and juror 11's piping experience. Moreover, the other jurors' declarations, submitted by the Nurseries with their motion for reconsideration, stated that jurors 2 and 11 disclosed their relevant knowledge during voir dire and the other jurors repeatedly stated

---

[12] Even if we considered the portions of juror 10's declaration that discuss juror 2's and juror 11's thought processes and statements made during jury deliberations, information that inheres in the verdict, neither those portions nor her one comment about a postverdict statement by juror 2 provide a basis for a finding of failure to disclose material information during voir dire or interjection of extrinsic evidence during deliberations. Juror 10's declaration actually indicates that juror 11 disclosed his knowledge of pipes during voir dire.

that the jury based its verdict solely on the evidence presented during trial.

¶36 Here, the record is silent about the actual questions asked of jurors during voir dire or even specific allegations of the allegedly unanswered voir dire questions; the McCoys' counsel did not point to the record where voir dire questions could be reviewed and did not point to specific questions that went unanswered by these jurors. Further, the McCoys' counsel does not allege in her declaration that jurors 2 and 11 interjected extrinsic information during deliberations; thus, we cannot conclude that jurors 2 and 11 committed misconduct by failing to disclose material facts during voir dire or by interjecting extrinsic evidence into deliberations. On this record, the McCoys do not show that during voir dire, juror 2 or juror 11 failed to disclose potentially material facts that indicated bias[13] or any of the other allegedly omitted information.

¶37 We hold that substantial evidence in the record does not support the trial court's findings of fact 1, 2, 3, and 4 that jurors 2 and 11 failed to disclose information during voir dire, or its conclusion of law that a failure to disclose was coupled with the interjection of extrinsic evidence during deliberations. In fact, the evidence in the record states otherwise: these jurors appropriately brought their disclosed life experiences to bear on the evidence presented throughout 16 days of trial during jury deliberations.

¶38 As the McCoys present no evidence relating to asked and answered voir dire questions relevant to material information that would have led to a challenge for cause of jurors 2 and 11, and no evidence of the interjection of

---

[13] The McCoys' counsel alleges bias based on juror 2's claimed failure to disclose during voir dire previous property problems similar to the McCoys' circumstances, her failure to disclose her feelings that individuals should "take responsibility" for such problems occurring on their own property, and her response to counsel's postverdict question about how she perceived counsel's presentation of the case. CP at 155. But, as stated elsewhere, the McCoys' counsel has not pointed to, nor has she recalled, any inquiry directed to juror 2 that was intended to elicit any of this information during voir dire.

extrinsic information during deliberations, we hold that the trial court exercised its discretion based on untenable grounds because the record does not support its factual findings of juror misconduct based on the nondisclosure of material facts during voir dire and the introduction of extrinsic evidence during deliberations. *Quismundo*, 164 Wn.2d at 504. Accordingly, we hold that the trial court abused its discretion when it granted a new trial based on jury misconduct and when it denied the Nurseries' and Pierce County's motion for reconsideration.

## B. Declaration Discussing Juror Deliberations

¶39 The Nurseries and Pierce County also contend that the trial court abused its discretion in considering juror 10's reply declaration in assessing whether juror misconduct occurred because the McCoys untimely filed the declaration and because it addressed the mental processes the jury members used and discussions the jurors engaged in during deliberations. Although we hold that the McCoys timely filed juror 10's declaration because CR 59(c) permits reply affidavits from a party seeking a new trial, we also hold that the trial court abused its discretion in considering the declaration's contents that discuss information that inhered in the jury verdict.

¶40 We generally do not inquire into the internal process by which the jury reaches its verdict. *Gardner v. Malone*, 60 Wn.2d 836, 840, 376 P.2d 651 (1962). " 'The individual or collective thought processes leading to a verdict inhere in the verdict and cannot be used to impeach a jury verdict.' " *Breckenridge*, 150 Wn.2d at 204-05 (internal quotation marks omitted) (quoting *State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988)). "Thus, a juror's postverdict statements regarding the way in which the jury reached its verdict cannot be used to support a motion for a new trial." *Breckenridge*, 150 Wn.2d at 205. We may, however, rely on affidavits to establish a juror's acts constituting misconduct without probing their mental processes or

other matters inhering in the verdict. *See Robinson*, 113 Wn.2d at 160.

¶41 In *Gardner*, our Supreme Court described the test for determining whether evidence of misconduct inheres in the verdict: "One test is whether the facts alleged are linked to the juror's motive, intent, or belief, or describe their effect upon him. . . . Another test is whether that to which the juror testifies can be rebutted by other testimony without probing a juror's mental processes." 60 Wn.2d at 841. Our Supreme Court has further elaborated:

> The mental processes by which individual jurors reached their respective conclusions, their motives in arriving at their verdicts, the effect the evidence may have had upon the jurors or the weight particular jurors may have given to particular evidence, or the jurors' intentions and beliefs, are all factors inhering in the jury's processes in arriving at its verdict, and, therefore, inhere in the verdict itself, and averments concerning them are inadmissible to impeach the verdict.

*Cox v. Charles Wright Acad., Inc.*, 70 Wn.2d 173, 179-80, 422 P.2d 515 (1967).

¶42 In *Breckenridge*, although the trial court excluded portions of Temple's declaration because the information inhered in the verdict, it considered the following statements in ordering a new trial:

> "[Corson] argued that other emergency room doctors would have behaved in the very same fashion as Dr. Nowak had and supported his position from personal experience. During deliberations he cited the experiences of his wife, who suffers from migraines. Mr. Corson told the jury that his wife had gone to emergency rooms several times with symptoms similar to those experienced by Lynda Breckenridge on November 19, 1996, and that never was a CT scan ever discussed or done on his wife. He used that experience to argue that, since other doctors behaved in that fashion in similar circumstances with his wife, Dr. Nowak must have met the standard of care. He made reference to this argument at least three times and, upon repeating his statements, prefaced his remarks, 'Again I keep coming back to my wife's experiences,' or substantially similar language."

*Breckenridge*, 150 Wn.2d at 206 (alteration in original) (quoting *Breckenridge* Clerk's Papers at 69).

¶43 On review, our Supreme Court reasoned that these statements from Temple's declaration explained "Corson's reasons for weighing the evidence in the case the way that he did and for believing . . . that Nowak was not negligent in his diagnosis and treatment of Breckenridge." *Breckenridge*, 150 Wn.2d at 206. Thus, it held that the trial court abused its discretion in granting a new trial because these statements inhered in the verdict. *Breckenridge*, 150 Wn.2d at 206-07.

¶44 Like Corson's statements during deliberations in *Breckenridge*, the statements juror 10 attributes to juror 2, comparing juror 2's previous permitting experiences with Pierce County to the McCoys' circumstances and arguing with juror 10 about the permissive use agreement, explained juror 2's individual thought processes and reasons for weighing the evidence as she did. Juror 10's additional statement about juror 2 that "after deliberation, she stated that she and her husband took ownership and fixed their problems and did not go after the County even though they could have," was not information interjected into deliberations since it was made after the verdict was returned, and read in open court, and the jury had been dismissed. CP at 194. Likewise, juror 10's statements about juror 11's reasons for weighing the experts' testimony and evidence about "jet-rodding" inhere in the verdict.

¶45 As *Cox* instructs:

> The mental processes by which individual jurors reached their respective conclusions, their motives in arriving at their verdicts, the effect the evidence may have had upon the jurors or the weight particular jurors may have given to particular evidence, or the jurors' intentions and beliefs, are all factors inhering in the jury's processes in arriving at its verdict, and, therefore, inhere in the verdict itself, and averments concerning them are inadmissible to impeach the verdict.

70 Wn.2d at 179-80. The statements in juror 10's declaration were inadmissible to impeach the jury's verdict because (1) they clearly speak to matters that either inhere in the verdict, i.e., how jurors 2 and 11 regarded the evidence, their mental processes, and how they and the other jurors considered and discussed the evidence in reaching their verdicts or (2) they speak to a comment by juror 2 after the jury reached its verdict.

¶46 Thus, we hold that the trial court abused its discretion in considering juror 10's declaration to support the McCoys' motion for a new trial based on juror misconduct that interjected extrinsic evidence into deliberations. The trial court's findings of fact 5, 6, 7, and 8, that extrinsic evidence was interjected into deliberations, are not supported by admissible evidence. Because the evidence does not support those findings of fact, the trial court's conclusion of law that extrinsic evidence may have affected the jury's verdict based on juror 10's declaration, entitling the McCoys to a new trial, is not supported by proper findings of fact.

III. Jury Verdict Supported by Substantial Evidence

¶47 The Nurseries also argue that substantial evidence supports the jury's verdict and that the trial court abused its discretion in granting a new trial under CR 59. We agree.

¶48 We review the grant or denial of a motion for a new trial based on an evidentiary challenge under the same standard as a motion for judgment as a matter of law. *Hizey v. Carpenter*, 119 Wn.2d 251, 272, 830 P.2d 646 (1992). The trial court ruled that a new trial was warranted under CR 59(a)(1), 59(a)(3), 59(a)(5), 59(a)(6), and 59(a)(9) because the "great weight of evidence presented at trial established water trespass" by the Nurseries due to their admissions that their water was entering the McCoys' property without permission and they (the Nurseries) were not making efforts to block their water from doing so. CP at 251.

¶49 On appeal, the McCoys argue this issue only on the basis of evidence supporting water trespass. Other than this general evidentiary challenge, the McCoys do not identify, and the trial court made no findings of, procedural irregularities, accident or surprise, inadequate damages resulting from juror prejudice, or error in the amount of recovery as contemplated by CR 59(a)(1), 59(a)(3), 59(a)(5), and 59(a)(6). We thus consider only the McCoys' evidentiary challenge to the verdict and the trial court's ruling under CR 59(a)(9). *See Jaeger v. Cleaver Constr., Inc.*, 148 Wn. App. 698, 717-18, 201 P.3d 1028, *review denied*, 166 Wn.2d 1020 (2009). We observe that granting new trials under CR 59(a)(9) for "lack of substantial justice" should be rare because of the other broad grounds for relief under CR 59(a). *Jaeger*, 148 Wn. App. at 717-18; *see also Kohfeld v. United Pac. Ins. Co.*, 85 Wn. App. 34, 41, 931 P.2d 911 (1997).

¶50 " 'Overturning a jury verdict is appropriate only when [the verdict] is clearly unsupported by substantial evidence.' " *Faust v. Albertson*, 167 Wn.2d 531, 538, 222 P.3d 1208 (2009) (alteration in original) (quoting *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994)). Thus, we review whether substantial evidence supports the verdict. *Faust*, 167 Wn.2d at 537. Such a challenge to the verdict " 'admits the truth of the opponent's evidence and all inferences which can reasonably be drawn [from it].' " *Faust*, 167 Wn.2d at 537 (alteration in original) (quoting *Davis v. Early Constr. Co.*, 63 Wn.2d 252, 254, 386 P.2d 958 (1963)).

¶51 "We interpret the evidence 'against the [original] moving party and in a light most favorable to the opponent.' " *Faust*, 167 Wn.2d at 537-38 (alteration in original) (quoting *Davis*, 63 Wn.2d at 254). We defer to the trier of fact on issues involving conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence. *See Faust*, 167 Wn.2d at 537-38. Jury instructions to which no exceptions are taken become the law of the case. *Guijosa v.*

*Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 917, 32 P.3d 250 (2001).

¶52 Here, the Nurseries did not dispute that their water was flowing through the drainage system under the McCoys' property. The McCoys assert that they were entitled to a favorable verdict because the Nurseries admitted that water flowed from their property under the McCoys' property through the damaged drainage system. In doing so, the McCoys fail to account for all the evidence before the jury and the trial court's jury instructions.

¶53 During 16 days of trial, the jury heard, in addition to the Nurseries' admission that water flowed from their properties under the McCoys' property, that (1) water was entering the McCoys' property through a drainage system that gathered water from its natural course across the McCoys' property; (2) the water was entering the McCoys' property outside the drainage system because the drainage system failed; (3) Harold Hahn extended the drainage system to drain directly into Horse Haven Creek; (4) submerging the drainage system's terminal point in Horse Haven Creek created backflow contributing to the drainage system's failure; (5) using heavy machinery on the McCoys' property could have broken, and did in the past break, the drainage pipes; (6) both Harold Hahn and Tom McCoy had used heavy machinery on the McCoys' property; (7) Tom McCoy filled the sinkholes on lot 3 without repairing the broken pipes he observed in the sinkholes; (8) the damage to the McCoys' property worsened after Tom McCoy filled the sinkholes on lot 3; and (9) due to the broken drainage system and the McCoys' berm, the water flowing from the catch basin collected and deepened until it flooded the Nurseries' property, killing their trees and making portions of the land unusable for their businesses. Moreover, the unobjected-to jury instructions properly instructed the jury on how to apply the law to the facts as it determined them after hearing all the evidence, argument of counsel, and the trial court's instructions.

¶54 Again, we interpret the evidence " 'against the [original] moving party and in a light most favorable to the opponent,' " and we defer to the trier of fact on issues involving conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence; therefore, we conclude that substantial evidence supported the jury's finding that Hahn's and the McCoys' acts were the proximate cause of water entering and damaging the McCoys' property outside the drainage pipes. *Faust*, 167 Wn.2d at 537-38 (alteration in original) (quoting *Davis*, 63 Wn.2d at 254). Further, substantial evidence supported a finding that the Nurseries' actions were not a proximate cause of the water damage to the McCoys' property and, thus, the McCoys failed to establish an essential element of trespass. Substantial evidence also supports the jury's verdict that the McCoys were negligent and that their negligence proximately caused the Nurseries' damages and that Tom McCoy's trespass on the Nurseries' property had proximately caused the Nurseries' damages.

¶55 Therefore, the trial court abused its discretion in ordering a new trial under CR 59(a)(9) based on its opinion that the jury verdict did not do substantial justice. We reverse and remand for vacation of the trial court's order granting a new trial and for reinstatement of the jury's verdict.[14]

IV. ATTORNEY FEES

¶56 Kent Nursery and Fir Run Nursery request their reasonable costs and attorney fees under RAP 14.3. RAP 14.2 and RAP 14.3 allow an award of costs, including statutory attorney fees, to the "substantially prevail[ing]" parties. Similarly, RAP 18.1 allows attorney fees on appeal if applicable law authorizes them. But Kent Nursery and Fir Run Nursery fail to provide any argument or authority

---

[14] Because we reverse and remand for reinstatement of the jury's verdict, we do not consider whether the trial court erred in denying Pierce County's repeated motions for dismissal from the lawsuit.

supporting their request for additional attorney fees; thus, we do not consider their request. RAP 10.3(a)(6). Because Kent Nursery and Fir Run Nursery prevail on appeal, however, we award their costs on appeal, including statutory attorney fees, to be determined upon compliance with RAP 14.4. *See State ex rel. Munroe v. City of Poulsbo*, 109 Wn. App. 672, 682-83, 37 P.3d 319 (2002).

HUNT and QUINN-BRINTNALL, JJ., concur.

Reconsideration denied October 13, 2011.