# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| LISA M. AZORIT-WORTHAM, | No. 58389-5-II |
| Respondent, | |
| v. | |
| DEPARTMENT OF LABOR & INDUSTRIES, | UNPUBLISHED OPINION |
| Respondent, | |
| ALASKA AIRLINES, INC., | |
| Appellant. | |

VELJACIC, A.C.J. — In 2024, Alaska Airlines appealed a jury verdict that concluded the Board of Industrial Insurance Appeals (Board) had incorrectly denied Lisa Azorit-Wortham's workers' compensation claim. Alaska Airlines argued that the trial court improperly instructed the jury on the traveling employee doctrine in the context of an occupational disease and that substantial evidence did not support the jury's verdict. A majority of this court concluded that the trial court erred in instructing the jury on the traveling employee doctrine in the context of an occupational disease claim and reversed and remanded for a new trial. As such, we did not reach the issue of whether substantial evidence supported the jury's verdict.

In 2025, the Washington Supreme Court reversed, concluding that the trial court did not err in giving the instruction on the traveling employee doctrine. *Azorit-Wortham v. Dep't of Lab. & Indus.*, ___ Wn.3d ___, 578 P.3d 779 (2025). The Supreme Court remanded the case to this court to address the remaining issue of whether substantial evidence supports the jury's verdict

that Azorit-Wortham's contraction of COVID-19 should be covered as an occupational disease.[1]

We conclude substantial evidence supports the jury's verdict. We affirm.

## FACTS[2]

Azorit-Wortham is a Seattle-based flight attendant who was employed by Alaska Airlines for 17 years. While employed there, she contracted COVID-19 and filed a workers' compensation claim for benefits. The Department of Labor and Industries (L&I) allowed her occupational disease claim for COVID-19 in August 2020 with March 28, 2020, as the date of manifestation. Alaska Airlines protested L&I's decision in October 2020, but L&I affirmed its decision to allow Azorit-Wortham's occupational disease claim for COVID-19. Alaska Airlines appealed the decision to the Board.

## I. HEARING BEFORE THE BOARD

At the hearing before the Board, Azorit-Wortham testified that from March 16 to 27, 2020, she worked or deadheaded[3] eight flights that included trips to Seattle; Orange County, California; Boston; Washington, DC; and Nashville. These flights had a total of over 250 people on board,

---

[1] Alaska Airlines also assigned error to the trial court's denial of its motion for judgment as a matter of law distinct from whether sufficient evidence supports the jury verdict. However, it provided no argument for this assignment of error in its opening brief. As such, in its initial appeal, this assignment of error would have been waived. *See In re Det. of L.S.*, 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022) ("Where a party presents no argument on a claimed assignment of error, that assignment of error is waived."). In the respondent's brief, Azorit-Wortham addressed only the assignment of error pertaining to the employer's motion for judgment as a matter of law, and not the issue Alaska Airlines actually argued, which is insufficient evidence supporting the jury's verdict. The Department of Labor and Industries (L&I), however, addressed sufficient evidence in support of the verdict. We address only the issue the Supreme Court remanded for us to consider—whether substantial evidence supports the jury's verdict.

[2] These facts are taken directly from this court's opinion considering Alaska Airline's initial appeal. *See Azorit-Wortham v. Dep't of Lab. & Indus.*, 32 Wn. App. 2d 84, 86-92, 554 P.3d 1235 (2024), *rev'd and remanded*, ___ Wn.3d ___, 578 P.3d 779 (2025).

[3] Deadheading is when the flight crew members are on the plane as passengers but are not working.

including passengers and crew members.[4]  She said she would also have come into contact with hundreds of people walking through airports, taking transportation, and staying in hotels.  She testified that her job duties consisted of greeting passengers; making announcements; preparing snacks, drinks, and meals; and handing them out using the cart that is pushed down the aisle.  She also handled seat discrepancies, medical situations, "tending to [passengers'] needs, holding [a passenger's] baby, talking [passengers] through stress and anxiety, or just chatting with them."  Clerk's Papers (CP) at 317.

On March 27, Azorit-Wortham deadheaded a flight from Boston to Seattle.  She and two other deadheading crew members were moved to first class.  During this flight, Azorit-Wortham used the restroom several times, used the coffee maker and coffee supplies, and interacted with the crew.  Upon arrival, as a courtesy, Kaliko Howell, the in-flight supervisor for the Seattle base, informed both the working and deadheading crew members that the pilot who had been on the previous flight, the flight from Seattle to Boston, had tested positive for COVID-19.  That pilot had also possibly used the coffee pot.  The managing director of station operations support testified that all surfaces in the lavatory would have been cleaned and disinfected and that surfaces in the galley would have been wiped down as needed.  Howell testified neither the working crew members nor the deadheading crew members were required to quarantine.

Azorit-Wortham said she first began having symptoms on March 29.  She went to an urgent care clinic and took a COVID test on March 30.  She received confirmation that she tested positive for COVID-19 on April 1.  She testified that she and her family were being extra cautious during

---

[4] Azorit-Wortham testified there were 243 passengers and 45 crew members.  However, other places in the record list 53 crew members.  This figure (presumably) includes Azorit-Wortham.  *But see* Br. of Resp't (L&I) at 8 (claiming the total is 296).  It is unclear how many of the crew members overlapped on each flight.

the time between March 16 and March 27, including not attending social gatherings and only going out for necessities. Her credit card statements from early March showed she went to places such as Mod Pizza, Fred Meyer, Trader Joe's, Roundtable Pizza, Safeway, and a landscape supply company. On March 15, she went to Menchie's frozen yogurt. She also attended a baby shower in early March with 10 to 15 other women. Then, later in March, she went to Walmart and Costco. Azorit-Wortham's son's last day of in-person school was March 13, and her husband began working mostly remotely during the latter part of March. Azorit-Wortham said during this time, she came into contact with fewer than 10 people outside of work. Her husband testified that he exhibited COVID-19 symptoms 8 to 10 days after Azorit-Wortham returned home from the Boston to Seattle flight.

Dr. James Boswell, specializing in occupational medicine and environmental health, conducted an independent medical examination of Azorit-Wortham. He stated that the opinion he formed in his examination was based on the understanding that the other crew members deadheading with her had direct exposure to the pilot who tested positive for COVID-19. He concluded her employment did not increase her probability of contracting COVID-19.

> [Alaska Airline's Counsel:] Could [Azorit-Wortham] have been exposed to an individual with COVID-19 at any point in time over the two weeks before she first developed symptoms?
> [Boswell:] Yes.
> [Alaska Airline's Counsel:] When you're looking at an occupational disease claim, can you say that she would not have developed COVID-19 if she was not working as a flight attendant?
> [Boswell:] . . . I can say that her work exposure did not have anything to do on a probability scale with the fact that she came down with the disease. She could have developed the disease with or without the exposure at work.
> [Alaska Airline's Counsel:] And if the idea is, in order for an occupational disease to be allowable, that the condition must not only have developed from that exposure, but also that the individual would not have developed this condition but for distinctive conditions of employment, if that's the legal standard, how would you answer that?

[Boswell:] I know it's the legal standard. And you're absolutely correct, it is not due to, on a probability side, as to her work as a flight attendant.

CP at 408-09.

On cross-examination, Boswell clarified that even though his report stated that the COVID-19 exposure most likely occurred in the work setting, what he actually meant was that it was equally likely her exposure occurred in the working setting as opposed to somewhere else because "she could have been exposed anywhere." CP at 388.

Physician's assistant Kerry Scarvie began treating Azorit-Wortham on April 8, 2020, and assumed the role of her attending provider regarding her COVID-19 diagnosis and workers' compensation claim. Scarvie testified that

> the COVID exposure more likely than not occurred during the work setting. It was actually like a perfect storm. Clearly, she was exposed to many people at the airports, shuttles, hotels, as well as on the airplane. She was working in a confined space in close proximity, less than 6 feet away from people without a mask for extended periods of time. After reading her testimony about her relevant 14 days prior to her COVID exposure and home precautions, I believe this further substantiates it was more probable than not that she contracted COVID while at work
> [Azorit-Wortham's Counsel:] To the extent your answer didn't provide specifically this, I'll ask you: What are the distinctive conditions of [Azorit-Wortham's] employment as a flight attendant that influenced your opinion?
> [Scarvie:] Well, the fact that she was exposed to many people, worked in a very confined space, was without a mask, and was told by Alaska Airlines that the pilot she had flown with was positive for COVID.
> [Azorit-Wortham's Counsel:] Now, if I modify those facts for you a little bit and ask you to assume that she didn't actually fly with the COVID-positive pilot; she boarded a plane that the COVID-positive pilot had just been on. So she actually wasn't on the same plane. Does that change your ultimate causation opinion in this case?
> [Scarvie:] No.

CP at 430-31.

Scarvie stated that she thought Azorit-Wortham got COVID-19 "from respiratory droplets from another person" and not from touching a surface. CP at 441. However, she also stated she

must have "missed" Azorit-Wortham's testimony that she was going to grocery stores during the two weeks prior to March 30. CP at 450.

The Board found Boswell's testimony more persuasive than Scarvie "because of his expertise in occupational medicine and environmental health, his understanding of the COVID-19 virus and the changing nature of how it is transmitted, precautions that work, and the constant changing nature of the virus, and [the fact that] he had a better foundation to make a causation opinion." CP at 49.

The Board ultimately concluded that "the preponderance of the evidence simply does not establish Ms. Azorit-Wortham's COVID-19 condition arose naturally and proximately out of the distinctive conditions of her employment." CP at 50. The Board reversed the order awarding benefits and remanded for L&I to reject the claim. Azorit-Wortham appealed the Board's decision to superior court.

## II.    TRIAL

At trial, the administrative record was read to the jury. The jury returned a verdict in favor of Azorit-Wortham, finding that the Board was incorrect in determining her COVID-19 claim should not be covered as an occupational disease.

Alaska Airlines appealed arguing that the trial court improperly instructed the jury on the traveling employee doctrine and that substantial evidence did not support the jury's verdict. As explained above, a majority of this court reversed and remanded for a new trial after concluding the trial court erred by instructing the jury on the traveling employee doctrine. *Azorit-Wortham*, 32 Wn. App. 2d at 99. The Washington Supreme Court reversed this court and held that the trial court did not err in giving the instruction on the traveling employee doctrine. *Azorit-Wortham*, 578 P.3d at 787.

The Supreme Court remanded the case to this court to address the sole issue of whether substantial evidence supports the jury's verdict. *Id.*

ANALYSIS

Alaska Airlines argues substantial evidence does not support the jury's verdict that Azorit-Wortham's COVID-19 claim should be covered as an occupational disease. We disagree.

I. SUBSTANTIAL EVIDENCE SUPPORTS JURY'S VERDICT

A. Legal principles

Under the Industrial Insurance Act, on appeal, we "review[] the decision of the trial court in the same way as [we] do[] other civil cases." *Butson v. Dep't of Lab. & Indus.*, 189 Wn. App. 288, 296, 354 P.3d 924 (2015); RCW 51.52.140. "'[R]eview is limited to examination of the [trial court] record to see whether substantial evidence supports'" the jury's verdict. *Rogers v. Dep't of Lab. & Indus.*, 151 Wn. App. 174, 180, 210 P.3d 355 (2009) (internal quotation marks omitted) (quoting *Ruse v. Dep't of Lab. & Indus.*, 138 Wn.2d 1, 5, 977 P.2d 570 (1999)).

Substantial evidence is evidence "'sufficient to persuade a fair-minded, rational person of the truth of the declared premise.'" *Mancini v. City of Tacoma*, 196 Wn.2d 864, 886, 479 P.3d 656 (2021) (internal quotation marks omitted) (quoting *Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 915, 32 P.3d 250 (2001)). To determine if a jury's verdict is supported by substantial evidence, we view the evidence "in the light most favorable to the nonmoving party." *Herriman v. May*, 142 Wn. App. 226, 232, 174 P.3d 156 (2007). "We defer to the trier of fact on issues involving conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence." *McCoy v. Kent Nursery, Inc.*, 163 Wn. App. 744, 769, 260 P.3d 967 (2011). "'[T]he reviewing court will not substitute its judgment for that of the jury, so long as there was evidence which, if believed, would support the verdict rendered'" *Burnside v. Simpson Paper Co.*, 123

Wn.2d 93, 108, 864 P.2d 937 (1994) (quoting *State v. O'Connell*, 83 Wn.2d 797, 839, 523 P.2d 872 (1974)).

To prove an occupational disease under the Industrial Insurance Act, a claimant must show their disease arose (1) "naturally" and (2) "proximately" from their employment. RCW 51.08.140;[5] *Dennis v. Dep't of Lab. & Indus.*, 109 Wn.2d 467, 481, 745 P.2d 1295 (1987); *Potter v. Dep't of Lab. & Indus.*, 172 Wn. App. 301, 311, 289 P.3d 727 (2012). To satisfy the first element, that a disease arose "naturally" from employment, a claimant must show

> that his or her occupational disease came about as a matter of course as a natural consequence or incident of distinctive conditions of his or her particular employment. The conditions need not be peculiar to, nor unique to, the worker's particular employment. Moreover, the focus is upon conditions giving rise to the occupational disease . . . and not upon whether the disease itself is common to that particular employment. The worker, in attempting to satisfy the "naturally" requirement, must show that his or her particular work conditions more probably caused his or her disease . . . than conditions in everyday life or all employments in general; the disease . . . must be a natural incident of conditions of that worker's particular employment. Finally, the conditions causing the disease . . . must be conditions of *employment*, that is, conditions of the worker's particular occupation as opposed to conditions coincidentally occurring in his or her workplace.

*Dennis*, 109 Wn.2d at 481 (emphasis in original).

To satisfy the second element, that their disease arose "proximately" from employment, a claimant must establish through "competent medical testimony" that "the disease is probably, as opposed to possibly, caused by the employment." *Id.* at 476. To establish this causation, "it is sufficient if 'a reasonable person can infer' from the medical testimony, in conjunction with lay testimony, 'that the causal connection exists.'" *Street v. Weyerhaeuser Co.*, 189 Wn.2d 187, 197,

---

[5] RCW 51.08.140 defines "occupational disease" as "such disease or infection as arises naturally and proximately out of employment under the mandatory or elective adoption provisions of this title."

399 P.3d 1156 (2017) (quoting *Sacred Heart Med. Ctr. v. Carrado*, 92 Wn.2d 631, 637, 600 P.2d 1015 (1979)). Therefore, proving causation does not require the use of any "magic words." *Id.*

For example, in *Carrado*, our Supreme Court held that sufficient evidence supported the jury's finding that a nurse's employment caused her to contract hepatitis even though medical testimony showed "it is virtually impossible to pinpoint the precise source of a given case of hepatitis." 92 Wn.2d at 633.

However, in *Gast v. Department of Labor and Industries*, this court affirmed a denial of benefits for a worker claiming a stress-related occupational disease caused by coworkers spreading rumors. 70 Wn. App. 239, 240-41, 852 P.2d 319 (1993). The court held that rumors spread by coworkers were coincidental and not a natural consequence of distinctive conditions of employment. *Id.* at 243. Similarly, in *Witherspoon v. Department of Labor and Industries*, this court reversed a jury finding that a slaughterhouse worker had an occupational disease because he contracted meningitis from a coworker who coughed in his face. 72 Wn. App. 847, 849, 851, 866 P.2d 78 (1994). The court reasoned that there was insufficient evidence to show "that the conditions of [the worker's] employment caused him to be in contact with the bacteria any more than he would be in ordinary life or other employments. His exposure to meningitis in the workplace as opposed to elsewhere was merely coincidental and not a result of any distinctive conditions of his employment." *Id.* at 851.

B. Analysis

Here, Azorit-Wortham testified that before she was diagnosed with COVID-19, she worked or deadheaded eight flights with over 250 people on board. She testified her job duties consisted of greeting passengers; making announcements; preparing snacks, drinks, and meals and handing them out; handling seat discrepancies; medical situations; and tending to passengers' needs during

flights. She also stated she had to come into contact with large numbers of people going through airport terminals, taking transportation, and staying in hotels. A fair-minded person could have found, based on Azorit-Wortham's testimony, that the repetitive airport terminal traffic, shuttle travel, and hotel stays in conjunction with the one-on-one interactions required to handle the varying situations that arise mid-flight on an airplane were distinctive conditions of employment that "more probably caused [] her disease . . . than conditions in everyday life." *Dennis*, 109 Wn.2d at 481. Viewing the evidence in the light most favorable to Azorit-Wortham, this was sufficient to show the disease arose naturally from employment.

While Azorit-Wortham's testimony was sufficient to satisfy the "arising naturally" requirement, Scarvie's testimony that Azorit-Wortham's employment more probably than not caused her to get COVID-19 was sufficient to satisfy the "proximately" requirement. Scarvie's medical testimony established that the conditions of her employment created a "perfect storm" for her to contract COVID-19 and that her contraction of COVID-19 was "probably, as opposed to possibly, caused by the employment." *See Id.* at 477; CP at 430.

Alaska Airlines argues Dr. Boswell's testimony rebuts Scarvie's testimony and shows proximate causation cannot be met. But we do not reweigh the evidence or determine the credibility of a witness. *Burnside*, 123 Wn.2d at 108. That is the province of the jury, and so long as there was evidence which, if believed, would support the verdict rendered, this court will not disturb it. *Id.*

The jury here must have believed Scarvie's medical testimony, that "it was more probable than not that [Azorit-Wortham] contracted COVID while at work" due to the distinctive conditions of her employment. CP at 430. Accordingly, based on Azorit-Wortham's and Scarvie's testimony,

sufficient evidence supports the jury's verdict that the Board was incorrect in determining Azorit-Wortham's COVID-19 claim should not be covered as an occupational disease.

CONCLUSION

Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Lee, J.

_____
Glasgow, J.