# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| D. NORMAN FERGUSON and KAREN FERGUSON,<br><br>     Appellants.<br><br> v.<br><br>ALLEN MCKENZIE and JANE MCKENZIE, husband and wife,<br><br>     Respondents. | No. 46774-7-II<br><br><br><br>UNPUBLISHED OPINION |

MELNICK, J — D. Norman and Karen Ferguson appeal the trial court's judgment in favor of Allen and Jane McKenzie,[1] and its denial of the Fergusons' request to quiet title and to adjust the Fergusons' property to include a disputed strip of property claimed through adverse possession. The Fergusons argue that substantial evidence did not support the trial court's findings of fact and irrelevant evidence should have been excluded. We affirm.

FACTS

I. FACTUAL OVERVIEW

In 1987, Christopher Slye built a house on the southern end of Bainbridge Island. In 1994, D. Norman purchased the property from Slye and began residing on it. The next year, he married Karen and together they lived on the property. The Fergusons claimed that since 1994 until the installation of a fence in 2011, they adversely possessed a strip of property where they installed landscape grass, trimmed the grass, and used it for their compost pile, wood chopping, and storage.

---

[1] To avoid confusion, we will refer to the parties by their first names. We intend no disrespect.

The McKenzies own the neighboring parcel east of the Ferguson's property. They reside on another parcel north of the east parcel. The strip of property the Fergusons claimed they maintained is contained within the McKenzie's property description.

The McKenzies built a fence along the surveyed boundary line between their property and the Ferguson property, blocking the Fergusons' access to the disputed strip. Six months after the construction of the fence, the Fergusons initiated an adverse possession claim. On June 3, 2011, the Fergusons brought an action seeking to quiet title to the disputed strip, alleging they adversely possessed the property from June 23, 1994 until approximately June 23, 2004.[2]

II.    FINDINGS OF FACT

After a bench trial, the trial court entered written findings of fact and conclusions of law, along with a judgment quieting title in the McKenzies. In its findings of fact, the trial court determined that because the "parties have asserted many contradictory facts . . . this [c]ourt has carefully considered the credibility of the witnesses." Clerk's Papers (CP) at 542. The trial court found Slye and the McKenzies to be more credible on all issues of contradiction between the parties, and that ultimately the Fergusons did not prove the elements of adverse possession by a preponderance of the evidence. The trial court's extensive findings, relevant to this appeal follow.

> 10. The Fergusons claim that during the 10-year period at issue, they stored firewood and furniture on the disputed strip, conducted landscaping on the disputed strip, and participated in other backyard activities there. The McKenzies state that they walked their property from time to time and that they observed none of these activities taking place in the disputed strip.
>
> 11. The Fergusons maintain that when they purchased the property from Slye, it was cleared and covered in ornamental plants and grasses. Slye testified that when he owned the property it was covered in thick natural brush, typical of an undeveloped piece of property in the Pacific Northwest.

---

[2] Slye was a named party, but was granted summary judgment and dismissal. None of the parties has appealed from this trial court action.

12. D. Norman Ferguson claims that before purchasing the Ferguson property from Slye, Ferguson and Slye discussed the legal description and the boundary line. The Fergusons claim that Slye identified the boundary as running from a boundary-line marker at the north of the property extending south to the telephone pole. Such a property line would include the disputed strip in the Ferguson parcel.

13. Slye denied this claim. Slye stated that he advised D. Norman Ferguson that there were approximately five feet between the house deck and the legal property line. Slye further stated that he gave D. Norman Ferguson Exhibit D1, a septic system application for permit, during the sale negotiations. The septic system permit application included a plat map of the legal boundaries. D. Norman Ferguson acknowledged receiving only a single page of the septic system permit application, claiming that he did not receive the entire document including the plat map. The Fergusons have not proven by a preponderance of the evidence that D. Norman Ferguson did not receive the entire septic system permit application, including the plat map.

14. On this point, Slye's testimony is more credible than D. Norman Ferguson's testimony. It is reasonable, if not likely, that Slye gave D. Norman Ferguson the entire septic system permit application, as it would make little sense for Slye to provide D. Norman Ferguson with only one page of the document. This Court is persuaded that it is more likely that Slye gave D. Norman Ferguson the entire document rather than just the cover sheet. Thus, it would be a clear contradiction and very unlikely that Slye identified the power pole as the property line marker, as claimed by D. Norman Ferguson. Identifying the power pole as the property line marker would be nonsensical in light of the septic system permit application Slye gave D. Norman Ferguson when they discussed the property line prior to the purchase. To accept the Fergusons' rendition of this representation, Slye would have had to have been unaware of the property line as it legally existed, which is unlikely given its inclusion in the septic system permit application, or would have had to have brazenly misrepresented the property line and contemporaneously called into question his own credibility to the potential purchaser by providing a copy of the septic system permit application while (allegedly) identifying the power pole as the property line marker, inconsistent with the septic system permit application.

15. It is also concerning that Karen Ferguson testified that the Fergusons did not receive the septic system permit application until after commencing the present litigation, contradicting D. Norman Ferguson's testimony that he received just a single page of the septic system permit-application during the presale negotiations. This raises concern about the credibility of both Fergusons as to their knowledge of the septic system permit application, which in turn leads to credibility concerns

regarding the Fergusons' claim that Slye identified the power pole as a property line marker.

16. Slye testified that he advised D. Norman Ferguson where the legal property line was in relation to the house and the deck. D. Norman Ferguson denies this. This Court finds that Slye is more credible on this issue in light of the provision of the application for the septic system permit. This is important as the septic system permit application contains a plat map showing the legal description of the property itself. The Fergusons are less credible on this issue given the inconsistencies about when they became aware of the septic system permit application.

17. D. Norman Ferguson relies heavily on photos taken during the construction of the residence. His theory is that Slye cleared the area of the disputed strip during construction and that the partial photographic shots of the construction site show that it was indeed cleared. The photos show only partial areas of the disputed strip. For example, the Fergusons rely on Exhibit 19 for the proposition that the disputed strip was cleared. Exhibit 19 depicts only a very limited area of the disputed strip where the construction was occurring. It is impossible to conclude that the whole disputed strip was cleared and planted. The McKenzies do not dispute that during Slye's construction, they permitted him to enter onto their property for construction purposes, causing certain areas within the disputed strip to be trampled on and effectively cleared, at least in part, to allow for construction machinery and construction work to be performed. The Fergusons tend to rely on this construction work and the effects of this construction work on the surrounding areas as proof that the disputed strip was permanently cleared, remained cleared, and was occupied by Slye as his own, thus presenting the disputed strip as his own when D. Norman Ferguson sought to purchase the property. The fact that there was construction does not prove that Slye had cleared and cultivated the disputed strip as the Fergusons claim. This is not supported by the evidence. The photos of the construction site do not illustrate what the land looked like as it existed in 1994. Even if this Court accepts that the area was cleared during construction, that was six to seven years before D. Norman Ferguson bought the property.

18. This Court accepts as credible Jane McKenzie's testimony that she visited her own property, which became the disputed strip, during Slye's construction, and observed and witnessed Slye's construction site many times. It defies reason to accept the Fergusons' claim that Slye cleared an area that encroached on the McKenzie property while Jane McKenzie passively looked on, allowing it to be cleared and effectively occupied by Slye from 1987 to the Fergusons' purchase in 1994. This Court would have to accept that Jane McKenzie not only observed Slye clearing the McKenzies' property, but allowed the clearing and the use of the property to exist thereafter. Jane McKenzie's rendition is more feasible in that she allowed the area to be trampled and effectively cleared as needed for construction

4

purposes.  This Court also accepts that Slye obtained permission from Jane McKenzie to encroach on the McKenzie property during the construction phase. This Court accepts that the encroachment was for a limited time and purpose, and that after the construction, the area affected regrew and returned to its natural state by 1994.  The Court is not persuaded that once Slye obtained permission to encroach, that he cleared the property and continued to occupy the disputed strip for several years until the sale in 1994.

. . . .

20. There is little photographic evidence that can be relied upon to definitively persuade this Court that the area cleared in the construction phase remained cleared and thereafter possessed in an open, notorious, and hostile fashion from 1994 to 2004.  The Fergusons argue that some photos of purportedly cleared and cultivated areas show areas located within the disputed strip.  These photos are ambiguous as to angle and depth and of limited value in drawing definitive and reliable conclusions.  By way of example, the Fergusons point to Exhibit 45 from 2003 for the argument that the disputed strip was cleared.  This photo is open to interpretation, and without a clearer picture as to depth, it is difficult to draw any conclusions.  Although the photos are open to interpretation, they are not dispositive.  The Fergusons have failed to carry their burden of proof with the photographic evidence.

21. When Slye occupied his residence, he sought the McKenzies' permission to trim trees in the disputed strip, to fill a well that was located in the disputed strip, to install electric utilities under the disputed strip, and to encroach upon a small portion of the disputed strip with his driveway and rock retaining wall.  The McKenzies gave their permission for these uses.  Consistent with this, Slye did not occupy the disputed strip before he sold the property to D. Norman Ferguson.  If Slye occupied the disputed strip, it would be inconsistent for him to seek out the McKenzies' permission to trim trees, fill the well, etc.

22. The Fergusons assert that a magazine cover from 1990, when Slye owned the property, demonstrates and supports the proposition that the vegetation seen through the kitchen window confirms that the property was cleared through the disputed strip.  One could argue that the area is cleared through to the trees, as trees can be seen.  But one could equally argue that because it is impossible to tell from the picture, specifically as it relates to angle and depth, how much shrubbery has been cleared below the windowsill, the area purported to be cleared and cultivated between the house and vegetation is difficult to tell from this exhibit.

23. The Fergusons' actions regarding their land use applications do not suggest that they considered the disputed strip to be a part of their property at the time of the

applications. Specifically, the Fergusons attempted to short plat their property in 2006, seeking to divide their two parallel properties into three lots. The pre-application conference request and the map show an eastern boundary that runs north and south. This boundary does not run in a diagonal that would be required if the disputed strip were included in the property description in their application. The hand-drawn map makes no reference to the disputed strip, or any portion of it, which presumably would have been included in the short-plat proposal for the three intended lots. Added to this is the Fergusons' certification that the 2006 short-plat application was true and correct. If in fact they believed that they had acquired the disputed strip through adverse possession, then it follows that the proposed boundary lines would have incorporated the disputed strip.

24. The Fergusons both attempt to minimize D. Norman Ferguson's involvement with the 2006 short-plat application, suggesting that he was a busy person and did not have much input into that application. This Court does not find this credible. Adjustment of property lines that affect future use and value of the property and desirability of the property are significant issues which are beyond the ordinary day-to-day household issues that might be discussed between husband and wife or couples. While it is possible that D. Norman Ferguson was unknowing about the 2006 application, this Court finds it less credible that the Fergusons were barely communicating about their plans for future development of the property with each other. This further raises doubts about D. Norman Ferguson's purported belief about the boundary line to his property, as the legal description and property lines were drawn and included in the proposed 2006 application to the City of Bainbridge Island. This application specifically did not include the area of the disputed strip, including the driveway, rock wall and underground utilities.

25. In 2010, the Fergusons recorded a Notice to Title for the Ferguson property. A survey was prepared by WestSound Engineering and was recorded as part of the Notice to Title. The survey shows the deck as being 5.5 feet from the eastern boundary.

26. The 2010 boundary-line-adjustment application was problematic for the Fergusons as demonstrated by the letter submitted by an attorney representing a neighbor, apparently identifying the actual size of the Ferguson property as falling short of the legal requirements for a boundary-line adjustment. This Court finds less than credible Karen Ferguson's testimony that she was not aware that they did not have the necessary square footage for the 2010 boundary-line adjustment application. The denial letter from the City of Bainbridge Island indicates that the application does not show conformity with the 20,000-square-foot-minimum lot area. It follows that the 2010 application was made by the Fergusons presenting their two legally described properties based upon the recorded legal property description. The Fergusons did not assert that their square footage of real estate

6

was more than the legal description based upon their claimed adverse possession. In this regard, the Fergusons did not hold themselves out to be the owners of the disputed strip, or any portion of the disputed strip. To the contrary, the 2010 application submits the legal boundary lines as the property lines to be considered for the boundary-line adjustment. There was no assertion that the disputed strip, or any portion of it, should be included in the Fergusons' parcel for that application.

27. Karen Ferguson also had previously attempted to purchase the property from the McKenzies. There was no mention that the Fergusons were asserting ownership over the disputed strip at the time they suggested the purchase, raising doubt that the Fergusons believed that they had acquired the property through adverse possession when those discussions occurred. Moreover, the Fergusons proposed to the McKenzies readjusting the boundary lines and reconfiguring the properties so the McKenzies would own the northern halves of the two properties and the Fergusons the southern two halves. No issue of occupation of the disputed strip was raised, again raising doubts with this Court about whether the Fergusons were hostilely asserting their ownership at the time that they were seeking to purchase. This again bolsters the McKenzies' position that the Fergusons have had a consistent motivation and goal to improve their property and that this claim of adverse possession may be yet another attempt. This creates further concern about the credibility of the Fergusons and weighs against them in being able to meet their burden of proof.

28. The fact that this quiet-title action followed the Fergusons' proposal to purchase from the McKenzies themselves, a failed attempt at a short plat, and then a few years later a boundary line adjustment, suggests that the Fergusons were intent on making their properties more attractive, profitable, and viable. It raises the specter that this current litigation might be another attempt by the Fergusons to improve, increase, and/or realign their property and raises the question as to whether they were really adversely possessing the disputed strip at the time in question, or whether this current litigation is yet another similar attempt to increase their property size and configuration.

29. The aerial photo, while not dispositive, offers some corroboration of the McKenzies' position. While these photos were not interpreted by an expert, it does appear that the February 28, 2007 photo shows a less treed and overgrown area than the earlier photo of 2002. More importantly, the 2002 photo appears to show significant growth in the disputed strip. The photo speaks for itself and it is not refuted by any expert testimony; only argument by the attorney for the Fergusons that they are unreliable. On its face, the 2002 photo suggests significant growth in the disputed strip, supporting the McKenzies' position that it was not cleared or cultivated at this critical time which falls in the period claimed to be adversely possessed. This Court is not intending to inflate the value of the 2002 photo as it

7

was not professionally explained, and so while it bears relevance, the weight is of limited value. Even if this photo had not been presented, this Court would still arrive at the same conclusion.

[3]30. In 2011, the McKenzies constructed a fence in the disputed strip six inches on their side of the correct property line. The photos taken after the fence was constructed have little bearing on the condition of the disputed strip during the relevant time period of 1994 to 2004. The photos that show the state of the vegetation after the fence was constructed, fall far outside of the relevant adverse-possession time frame. These photos overall bear little weight.

31. The Fergusons rely upon the purchase and sale agreement with Slye to demonstrate that Slye was required to point out the property markers and that the inspection report indicates that the purchaser (D. Norman Ferguson) accepted only one corner marker. While it is specific that one marker and not all markers were indicated, such an acknowledgement is of limited value. Presumably the corner that was identified was that in the north of the property. It does not necessarily follow, nor can this Court conclude, that Slye must have represented that the other property marker was the telephone pole. He might have, but it is unlikely in light of the septic system permit application which appears to have been provided to D. Norman Ferguson as previously found by the Court.

32. 2006 was a significant year regarding the disputed strip. There is testimony regarding the Fergusons' request to trim some trees in the disputed strip. Karen Ferguson is ambiguous about what happened as to that request. Jane McKenzie's note of a conversation regarding trimming of trees, or at least communication by voicemail, occurred on May 31, 2006, the same time that the Fergusons applied to the City of Bainbridge Island to develop the property through a short plat. The attempt to short plat the two Ferguson properties into three was rejected by the City of Bainbridge Island. In the same time period, the Fergusons requested to buy the McKenzies' property. The attempts in 2006 to develop the property fit in with the attempts around the same time to clear the property.

33. The attempt to adjust the boundary line in 2010 was met with opposition. In addition to the neighbor opposition to the short plat, which identified the shortage of square footage to allow for division of the properties, the City of Bainbridge Island sent letters to the Fergusons indicating that they needed more area if they were to divide. It was only six months after the City of Bainbridge Island canceled their application that this litigation began.

---

[3] The Fergusons do not challenge findings of fact 30-34. These findings are verities on appeal, but are important in considering the trial court's analysis.

34. As with all trials, the finder of fact may consider the evidence and lack of evidence. Once more, the Fergusons have the burden of proof. While there was considerable criticism espoused about the unreliability of the only non-party witness in the case Chris Slye, it became evident that while the Fergusons criticized Slye's testimony, they did not produce any testimony from a non-party and non-interested witness. It appears that the Fergusons are professional people who are engaged, and seem to work and be involved in the world around them. However, there is a marked absence of evidence, in that there is an absence of any testimony from family, friends, acquaintances, or neighbors who might have been able to testify regarding the use of the disputed strip from 1994 to 2004. Again, it is the Fergusons' burden. And the distinct lack of evidence further weakened the Fergusons' claim of adverse possession, which is a claim that relies, in this instance, heavily upon factual support.

CP at 542-51. The Fergusons appeal.

ANALYSIS

I.      SUBSTANTIAL EVIDENCE FOR FINDINGS OF FACTS

The Fergusons argue that a number of the trial court's findings are not supported by substantial evidence and do not support the trial court's conclusions. They also argue that we are not bound by the trial court's findings because the photographic evidence refutes them. The Fergusons rely on *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986), for support. Because substantial evidence supports the trial court's findings of fact and because the Fergusons misunderstand *Bering's* holding, we disagree.

A.      Standards of Review

The trial court's findings on the elements of adverse possession are mixed questions of law and fact. *Harris v. Urell*, 133 Wn. App. 130, 137, 135 P.3d 530 (2006); *Petersen v. Port of Seattle*, 94 Wn.2d 479, 485, 618 P.2d 67 (1980). The fact finder determines whether the essential facts giving rise to adverse possession exist. *Chaplin v. Sanders*, 100 Wn.2d 853, 863, 676 P.2d 431 (1984). "We review whether substantial evidence supports the trial court's challenged findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment."

9

*Harris*, 133 Wn. App. at 137; *Ridgeview Prop. v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). "Substantial evidence exists when there is a sufficient quantity of evidence to persuade a fair-minded, rational person of the truth of the finding." *Harris*, 133 Wn. App. at 137.

All unchallenged findings of fact are verities on appeal. *Harris*, 133 Wn. App. at 137. Here, the Fergusons assigned error to the findings of fact generally and only challenge a few of the trial court's findings of fact in their argument: 13, 14, 15, 18, 20, 22, 23, 24, 25, 26, 27, 28, and 29. Therefore, we will treat all the unchallenged findings as verities on appeal. *See Harris*, 133 Wn. App. at 137.

To establish a claim of adverse possession, a party must show that her possession of the claimed property was, (1) for ten years, (2) exclusive, (3) actual and uninterrupted, (4) open and notorious, and (5) hostile. *Chaplin*, 100 Wn.2d at 857. The party claiming adverse possession bears the burden of establishing the existence of each element by a preponderance of the evidence. *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989).

The Fergusons acknowledge that the trial court based its findings on its assessment of the witnesses' credibility. However, many of the Fergusons' challenges to the trial court's findings essentially ask us to reweigh the evidence and to evaluate the credibility of witnesses. We do not substitute our judgment for that of the trial court's regarding witness credibility or evidentiary weight. *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009).

To the extent that the Fergusons argue we are not bound by the trial court's findings because they are contrary to the photographic evidence, they misapprehend *Bering*. Our Supreme Court, relying on *State v. Rowe*, 93 Wn.2d 277, 609 P.2d 1348 (1980), stated, "Although this court is not necessarily bound by the trial court's findings when based *solely* upon written or graphic

evidence, the trial court in this case also considered considerable live testimony during a day-long show cause hearing." *Bering*, 106 Wn.2d at 220 (internal citation omitted).

In this case, the trial court heard extensive testimony. It clearly did not rely solely on written or graphic evidence. It clearly found that the photographs were susceptible to more than one interpretation. It clearly relied on the testimony and weighed the credibility of the witnesses and their testimony. Accordingly, *Bering*'s rule is inapplicable to this case.

B.      Septic System Permit Application

The Fergusons argue that the trial court's findings 13, 14, and 15, regarding the septic system permit application, are not supported by substantial evidence. The McKenzies argue that the findings are supported by Slye's testimony and the fact that D. Norman admitted in his deposition he received the septic permit application and plat maps that accurately depicted the legal boundary line, even though, at trial he testified that he only received the first page. The McKenzies argue that D. Norman was impeached at trial by his deposition testimony, "in which he acknowledged receiving from Slye during the sale process a 6-page document that included the septic permit application and the two plat maps showing the property boundaries." Br. of Resp't at 25.

Finding 16 supports the McKenzies' argument. The Fergusons did not challenge this specific finding, but it elaborates on the other findings regarding the septic system permit application. The trial court determined:

> Slye is more credible on this issue in light of the provision of the application for the septic system permit. This is important as the septic system permit application contains a plat map showing the legal description of the property itself. The Fergusons are less credible on this issue given the inconsistencies about when they became aware of the septic system permit application.

11

CP at 544. Findings 13, 14, and 15 were based on the trial court weighing the credibility of the witnesses' testimony. Substantial evidence supports each of these findings.

C.      Condition of the Disputed Strip in 1987

The Fergusons argue that finding 18, regarding the condition of the disputed strip in 1987 after Slye's construction of the house, is not supported by substantial evidence.

The trial court's entire finding turns on its assessment of credibility of the witnesses. The trial court clearly stated it accepted the credibility of Jane's testimony regarding her interactions with Slye during the construction period. The trial court also made clear that it did not find credible the Fergusons' version about the condition of the disputed strip in 1987 to 1994. The trial court stated that "[i]t defies reason to accept the Fergusons' claim." CP at 545. The trial court made its determination by weighing the credibility of witnesses. It found Slye's and Jane's version more credible. Substantial evidence supports finding 18.

D.      Condition of the Disputed Strip in 1994

The Fergusons argue that findings 18, 20, and 22, regarding the condition of the disputed strip when D. Norman purchased the property in 1994, are not supported by substantial evidence.

The Fergusons argue that based on the photographic evidence presented at trial, "no reasonable person would conclude that there was re-grown vegetation obscuring the view across the [d]isputed [s]trip," and that "[n]o effort was made to rebut any of this evidence." Br. of Appellant at 30. However, evidence presented at trial rebutted the Fergusons' testimony and the photographs. Slye testified regarding the condition of the disputed strip prior to his sale of the property to D. Norman in 1994.

Here, again, the Fergusons ask us to reweigh and reinterpret evidence and to substitute our judgment for that of the trial court. They argue that "no rational fair minded person would accept

[Slye's] testimony." Br. of Appellant at 31. But the trial court determined that the photographs presented at trial were not dispositive and they were "ambiguous as to angle and depth and of limited value in drawing definitive and reliable conclusions." CP at 546. In addition, in finding 22, the trial court stated that the photograph could support both parties' assertions, but it is "impossible to tell from the picture, specifically as it relates to angle and depth, how much shrubbery has been cleared [in] . . . the area purported to be cleared and cultivated." CP at 546. Substantial evidence supports these findings.

### E. Findings of Fact Related to Events Post-2004

The Fergusons argue that the trial court's findings 23-29, regarding events that took place post-2004, should not bear on whether adverse possession occurred and it is unclear to them why the trial court made these findings since the trial court stated this evidence would not be considered for substantive purposes.

The findings related to post-2004 events are only relevant to support the trial court's other findings that the Fergusons were not credible. The Fergusons do not claim substantial evidence did not support the trial court's findings 23-29.

## II. ADMISSION OF POST-2004 EVIDENCE

The Fergusons argue that the trial court erred in admitting evidence related to the time period after 2004.

### A. Standard of Review

A trial court has broad discretion in admitting evidence. *Hayes v. Wieber Enter., Inc.*, 105 Wn. App. 611, 617, 20 P.3d 496 (2001). We review a trial court's admission of evidence for an abuse of discretion. *McCoy v. Kent Nursery, Inc.*, 163 Wn. App. 744, 758, 260 P.3d 967 (2011).

"A trial court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *McCoy*, 163 Wn. App. at 758.

All relevant evidence is admissible. ER 402. "Evidence tending to establish a party's theory, or to qualify or disprove the testimony of an adversary, is relevant evidence." *Hayes*, 105 Wn. App. at 617. Therefore, a trial court has broad discretion in admitting testimony that would disprove the testimony of an adversary. *See Hayes*, 105 Wn. App. at 617.

B.      The Trial Court Did Not Abuse Its Discretion In Admitting Evidence

The trial court admitted evidence related to post-2004 events solely for the purpose of assessing credibility. At trial, the Fergusons objected, based on relevancy, to the admission of this evidence. The McKenzies argued that the Fergusons' conduct post-2004 was relevant because it "shows the Fergusons' true motivation here." 1 Report of Proceedings (RP) at 160. Furthermore, the McKenzies argued the evidence was relevant because it impacted D. Norman's credibility in that he

> claimed he has always believed this property to be his, always believed he owned the entire disputed strip. And yet he's making representations to the City representatives in recordings that actually show his property 5.5 feet from the boundary line and nine feet from the boundary line that's the 70 to 100 feet he claims is from the boundary.

1 RP at 161. The trial court admitted this testimony for the very limited purpose of determining credibility, and not for substantive purposes. Because the evidence was relevant to determine credibility, the trial court did not err.

14

III.    ATTORNEY FEES

The McKenzies argue that we should award them attorney fees under RAP 18.9 because the Fergusons' appeal is frivolous when it "challenges findings plainly supported by substantial evidence, and fails to even argue the only other assignment of error identified." Br. of Resp't at 46. In addition, the McKenzies also requested appellate costs as the prevailing party under RAP 14.2.

RAP 18.9(a) provides:

The appellate court on its own initiative or on motion of a party may order a party or counsel, or a court reporter or authorized transcriptionist preparing a verbatim report of proceedings, who uses these rules for the purpose of delay, files a frivolous appeal, or fails to comply with these rules to pay terms or compensatory damages to any other party who has been harmed by the delay or the failure to comply or to pay sanctions to the court.

"[A]n appeal is frivolous if, considering the entire record, the court is convinced that the appeal presents no debatable issues upon which reasonable minds might differ, and that the appeal is so devoid of merit that there is no possibility of reversal." *Advocates for Responsible Dev. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 170 Wn.2d 577, 580, 245 P.3d 764 (2010). "All doubts as to whether the appeal is frivolous should be resolved in favor of the appellant." *Advocates for Responsible Dev.*, 170 Wn.2d at 580.

The McKenzies adequately address the issue of attorney fees in their brief pursuant to RAP 18.1(b). The McKenzies cite *Streater v. White*, 26 Wn. App. 430, 434-35, 613 P.2d 187 (1980), arguing that an appeal is frivolous if the appeal is factual, the findings are supported by the evidence, and the findings support the legal conclusions because there are no debatable issues on appeal when the court may not substitute its judgment for that of the trial court on factual issues.

First, the Fergusons failed to comply with court rules because they did not specifically identify the findings of fact they were challenging in their assignments of error. Second, the

15

findings challenged were prefaced on the Fergusons request that we reweigh the evidence and reevaluate the credibility of witnesses. As we have previously stated, we do not substitute our judgment for that of the trial court's regarding witness credibility or the weight of the evidence. *See Quinn*, 153 Wn. App. at 717. Third, the findings are supported by substantial evidence. The Fergusons' arguments are without merit. Finally, the Fergusons failed to adequately argue their second assignment of error in their brief.

We agree that the Fergusons' appeal is frivolous because the appeal presented no debatable issues upon which reasonable minds could differ, and each argument the Fergusons presented was so devoid of merit that there is no possibility for reversal. Based on the foregoing, and pursuant to RAP 14.2, the McKenzies are the prevailing party. We grant the McKenzies' attorney fees and costs.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

I concur:

_____
Sutton, J.

16

BJORGEN, A.C.J. (dissenting) — Although I agree with the majority to affirm the merits of the trial court's decision, I cannot agree that the Fergusons' appeal presents "no debatable issues upon which reasonable minds might differ, and [that the appeal] is so totally devoid of merit that there [is] no reasonable possibility of reversal." *Tiffany Family Tr. Corp. v. City of Kent*, 155 Wn.2d 225, 241, 119 P.3d 325 (2005). Therefore, I dissent from the award of attorney fees to the McKenzies on appeal.

Bjorgen, A.C.J.
BJORGEN, A.C.J.