# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>R.D.<br><br>       Petitioner. | No. 56169-7-II<br><br><br><br>UNPUBLISHED OPINION |

VELJACIC, J. — R.D. appeals the trial court's order committing him to Western State Hospital for 90 days. He argues that medical records admitted at trial were not properly admitted as business records. He also argues that the trial court's conclusions that he is gravely disabled under RCW 71.05.020(24) and that he presents likelihood of serious harm under RCW 71.05.020(36) are not supported by substantial evidence.

We hold that the trial court did not err by concluding that the medical records were admissible as business records. We also hold that the trial court did not err by concluding that there is substantial evidence supporting that R.D. was gravely disabled under RCW 71.05.020(24) and presents a likelihood of serious harm under RCW 71.05.020(36). Accordingly, we affirm the trial court's order committing R.D. for 90 days at Western State Hospital.

FACTS

I. BACKGROUND

The State charged R.D. with burglary in the first degree for events that took place on June 21, 2019. Allegedly, R.D. had entered an auto repair shop and assaulted an employee. A competency evaluation completed by Dr. Deanna Frantz on August 10, 2019, found R.D. not

competent to stand trial, and R.D. was ordered to complete up to 90 days of competency restoration treatment in the Center for Forensic Services (CFS) at Western State Hospital. He was subsequently admitted to the CFS on September 23, 2019. Another evaluation completed by Dr. Samantha Story on December 12, 2019, again found R.D. not competent, and he was ordered to complete an additional 90 days of competency restoration treatment in the CFS. A final evaluation completed by Dr. Benjamin LaLiberte on March 10, 2020, again found R.D. not competent. The court entered an order dismissing the felony charges against R.D. and admitting him to Western State Hospital for a civil commitment evaluation. Two members of R.D.'s Western State Hospital care team, Dr. Mallory McBride and Dr. Daniel Ruiz-Paredes, petitioned the court for up to 180 days' additional involuntary treatment, alleging that R.D. was not ready for a less restrictive placement and requires continued treatment.

## II. TRIAL

A jury trial was held based on an amended petition filed by Dr. Nitin Karnik and Dr. Mallory McBride, seeking involuntary treatment of R.D. on the basis that he is gravely disabled and, as a result of a mental disorder, poses a likelihood of serious harm.

### A. Testimony

The first witness to testify was Dr. Karnik, a forensic psychiatrist at Western State Hospital, who attempted to interview R.D. formally and with a treatment team on several occasions. Dr. Karnik testified that R.D. has "always been hostile in his responses," and "has raised his fists up" when approached by hospital staff and has said, "Don't even try." 2 Report of Proceedings (RP) at 89-90. Dr. Karnik elaborated by explaining that "[R.D.] does not normally allow [treatment providers] to interview him[,] . . . [h]e either waves [them] off or he threatens [them]. . . . His response has been 'No, no, no,' to any questions." 2 RP at 96. R.D. would not engage in an

2

interview with Dr. Karnik even when told that the purpose of an evaluation is for his safety to return to the community. When asked if R.D. understands that he has a mental condition, Dr. Karnik answered no, he "does not believe he has any mental illness" and that R.D. has said to Dr. Karnik, "I don't need you," "[t]here's nothing wrong with me," and "[t]his is a conspiracy." 2 RP at 107.

According to Dr. Karnik's testimony, R.D. presents symptoms of "schizophrenia affective disorder" that need to be treated before he is eligible to live in a less restrictive setting. 2 RP at 99. Dr. Karnik testified that "[t]he disorder comes in the form of paranoia that [R.D.] expresses, [and] the delusional thoughts that he expresses about being poisoned." 2 RP at 97. Furthermore, Dr. Karnik described R.D. as "impulsive," and "frustrated when his needs are not met," and he "refuses to discuss his stay in the hospital except to yell that it is illegal, that there is a conspiracy against him," and he expresses "paranoid statements that his food is being poisoned." 2 RP at 97.

Dr. Karnik also testified as to R.D.'s aggressive behavior, stating that "[R.D.] will become physically agitated and raise his voice and shout and yell at the nurses and also engage in physical violence against objects and other persons." 2 RP at 103. R.D. was placed in a "seclusion room" because "he got aggressive with the security staff who were helping the laboratory technician's attempt to get a blood test from him." 2 RP at 104. Dr. Karnik testified that he believes the reason that no severe physical violence occurred is because of hospital staff intervention. Dr. Karnik's opinion is "that because of [R.D.'s] inability to have good control, it makes him overreact to situations . . . [and] have angry outbursts, which can be physical as well as verbal[,] . . . [which] puts him in danger of hurting others, and, by retaliation, of hurting himself because there are other peers that have retaliated against [R.D.]." 2 RP at 106. Dr. Karnik expressed concern that if R.D. goes into the community without treatment, his angry outbursts could occur against the public.

Dr. McBride, a licensed clinical psychologist and forensic evaluator working for Western State Hospital, also testified for the State. Dr. McBride testified to knowing R.D. since April 2020, and she has attempted to evaluate him several times for civil commitment. She expressed that R.D. has declined to meet with her all of the times that she has approached him. Her diagnosis of R.D. is "schizoaffective disorder bipolar type." 2 RP at 153. She described R.D.'s symptoms as "ongoing mood dysregulation and mood lability which in his case has included anger outbursts and episodes of aggression as well as delusional ideation. . . . In [R.D.'s] case, this has included beliefs regarding his diet at Western State Hospital, there being parasites in his food, for example, as well as beliefs of having organisms or kind of growths or those types of things growing inside of his head." 2 RP at 153.

In her testimony, Dr. McBride also described R.D.'s "anger outbursts, acts of aggression against persons and property, as well as a general kind of hostile attitude towards treatment providers." 2 RP at 155. When she first attempted to meet with R.D., he was verbally hostile toward her, swore at her, and told her "to leave him the F alone." 2 RP at 156. Dr. McBride testified that R.D. "remains quite aggressive at times," and "remains unpredictable in his behaviors" because his "mood dysregulation is not being treated currently which leads to [] angry and aggressive outbursts." 2 RP at 165. She also stated that "[R.D.] tends to be triggered by events that are hard to anticipate. . . . He has engaged in physical confrontation with peers with little provocation." 2 RP at 156. In Dr. McBride's opinion, "[g]iven the combination of symptoms that [R.D.] is currently exhibiting, he is not safe to go to the community until . . . he begins to participate in treatment and he begins to take medications that can manage these symptoms." 2 RP at 165-66.

According to Dr. McBride, R.D. does not understand his diagnosis, and for this reason is unable to care for his basic needs. She stated that R.D. has declined to meet with treatment providers and has stated that he does not believe he needs treatment or medication. Dr. McBride testified that the disorder R.D. has requires medication for treatment, and that R.D. has refused medication as well as any other treatment activities. She testified as to her belief that R.D.'s current symptoms are impacting his ability to care for his basic needs. Dr. McBride spoke about her concern that R.D. would not be able to care for himself because of the severity of his symptoms. She believes this will negatively affect his ability to adequately seek out resources in the community as well as his ability to successfully negotiate relationships with others in the community. Dr. McBride testified that in her opinion, moving R.D. from Western State Hospital poses a large risk because he remains so unpredictable and so volatile in his mood and behavior, which is not safe for him or others within the community.

B.      Hearsay Objections

R.D.'s counsel objected on hearsay grounds to the use of "chart notes" at trial. 1 RP at 9. The first objection was made when Dr. Karnik asked to refer to the chart notes in his testimony. The court allowed Dr. Karnik to refer to those notes, indicating that the notes constituted a business record and were therefore an exception to the hearsay rules.

The court did, however, require the State to lay a foundation for use of the chart notes. In doing so, Dr. Karnik explained that the "chart is a continuous running record of the patient's stay in the hospital [made by] physicians and by nursing staff[,] . . . anyone involved in the patient's treatment, and the record of medications that are prescribed for the patient." 2 RP at 91. He testified that he relies on the chart notes in his role, uses them to inform his opinion on the patient's condition and treatment, and considers them a reliable source of information. The court allowed

Dr. Karnik to refer to the notes, noting that "witnesses may refer to having reviewed documents from the court that specify this action or that action without admitting the declaration itself because that goes to inform the expert witness' opinion, and that is clearly admissible under the Expert Witness Rules 701 through 703." 2 RP at 31.

Dr. McBride discussed her use of the chart notes as well. She described that the staff treating R.D. have the opportunity to write in the chart, and that notes are required to be made within 24 hours of interacting with a patient. Dr. McBride also stated that she considers the chart notes to be reliable, and relies on them in order to form her opinion about patients. Additionally, Dr. McBride testified that "the progress notes [are] what [she has] reviewed to maintain [her] knowledge of [R.D.'s] case." 2 RP at 150. She explained that her interactions with him personally have been limited because of his refusal to meet with her, therefore her opinions have been based on his chart notes.

At the end of the trial, the admitted exhibits included 1, 4, 5, 7, 8, 9, and 16. Of those exhibits, R.D.'s counsel objected to 4, 5, 8, and 9. Those exhibits are all chart notes. Exhibit 4 is a progress note, detailing R.D.'s refusal to take medication and a threatening encounter with his medical team. Exhibit 5 is also a progress note, describing an incident in which R.D. got into a verbal altercation with staff and a peer, and kicked a plastic chair because he could not continue using the karaoke machine. Exhibit 8 is a post altercation risk assessment, describing R.D. becoming angry at a peer when R.D. was trying to sleep. The assessment describes R.D. as "[s]houting angrily," "[m]aking threats to harm," and "[m]aking menacing gestures toward" those involved. Ex. 8. Finally, exhibit 9 is a progress note describing R.D.'s refusal to take medication and describing an incident in which he punched a window. In admitting the exhibits over objections on double hearsay grounds, the court noted that:

6

> The statute does not require that the record be made by the person performing the lab test, but only that it was made in the regular course of business under circumstances which the Court finds makes it trustworthy.
>
> A practicing physician's records made in the regular course of business properly identified and otherwise relevant constitute competent evidence of the conditions that are recorded, so the double hearsay objection, I think, fails under our case law when it comes to medical records.

2 RP at 137.

### C.      Verdict

The jury found by clear, cogent, and convincing evidence: (1) that R.D. has a mental disorder; (2) that R.D. is gravely disabled; (3) that as a result of a behavioral health disorder, R.D. presents a likelihood of serious harm; (4) that a less restrictive alternative to involuntary treatment at Western State Hospital would not be in the best interest of R.D.; and (5) that R.D. should be involuntarily treated for a period not to exceed 90 days. The court entered an order on the verdict detaining R.D. to Western State Hospital for a maximum of 90 days.

R.D. appeals.

### ANALYSIS

R.D. argues that because the majority of the State's evidence was based on erroneously admitted chart notes, and the verdict was not supported by substantial evidence, the verdict should be reversed.

## I.      EVIDENTIARY RULINGS

R.D. appears to argue that the chart notes should not have been used as substantive evidence because an adequate foundation was not laid for their admission and they constitute inadmissible hearsay. We disagree.

A.    The State Laid a Proper Foundation for the Admission of the Chart Notes

R.D. challenges the admissibility of the chart notes as business records on the basis that the court permitted the introduction of the chart notes without requiring the State to lay an adequate foundation.[1]  We disagree.

1.    Legal Principles

Decisions involving evidentiary issues lie within the discretion of the trial court and ordinarily will not be reversed on appeal absent a showing of abuse of discretion.  *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997).  A trial court abuses its discretion if it improperly applies an evidence rule.  *State v. Young*, 160 Wn.2d 799, 806, 161 P.3d 967 (2007).

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.  ER 901.  "'Rule 901 does not limit the type of evidence allowed to authenticate a document[, i]t merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.'"  *State v. Payne*, 117 Wn. App. 99, 106, 69 P.3d 889 (2003) (quoting *United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989)).

To lay a proper foundation for the admissibility of evidence, testimony by one who has custody of the record as a regular part of his work or has supervision of its creation will suffice. *State v. Ben-Neth*, 34 Wn. App. 600, 603, 663 P.2d 156 (1983).  In *Cantrill v. American Mail Line*, 42 Wn.2d 590, 608, 257 P.2d 179 (1953), the court held that it is not necessary to examine the person who actually created the record so long as it is produced by one who has the custody of the record as a regular part of his work or has supervision of its creation.  In *State v. Rutherford*, 66

---

[1] R.D. does not tell us which exhibits he is challenging on appeal.

Wn.2d 851, 854, 405 P.2d 719 (1965), the supervisor of the person who conducted tests was permitted to produce the results as business records at trial.

In contrast, the court in *State v. DeVries*, 149 Wn.2d 842, 847, 72 P.3d 748 (2003), held that it was a manifest abuse of discretion for the trial court to admit an exhibit into evidence because the exhibit was not properly identified and authenticated by a witness. In that case, the state introduced the report at issue through an emergency room doctor, who testified by phone. *Id*. Critically, the doctor did not have a copy of the report before him to consult while testifying, and could not say that the report he had seen previously in the course of treatment was the same one that the prosecution sought to admit. *Id*.

         2.        Witness Testimony Provided an Adequate Foundation for Admission of the Chart Notes.

The testimony established that the records are what they were purported to be. Here, when Dr. Karnik asked to refer to the chart notes in his testimony, the court asked the State to lay a foundation as to the records. Dr Karnik identified the chart notes and described them as "medical records," a "record of a patient's evaluation from the time that he is in the hospital" containing "notes . . . written after observing the patient and . . . attempts to interact with the patient." 1 RP at 10. Dr. Karnik described how the chart notes "are organized according to progress notes by the physicians, the progress notes by the nursing staff and other support staff" with sections that "document medications . . . physical evaluations . . . [and] legal issues." 1 RP at 10. Notably, Dr. Karnik described how he relies on the "verbal as well as written documentation, notes of events that occur on a 24-hour basis" contained within the chart notes in order to do his job. 1 RP at 11. This testimony lays an adequate foundation for the chart notes to be admitted as business records.

Dr. McBride also testified as to the chart notes. When asked if she finds the chart notes to be reliable, Dr. McBride answered "Yes." 2 RP at 151. Dr. McBride also answered in the

affirmative when asked if she relies on the chart notes to do her job. She explained that those who write chart notes are "staff that treat [R.D.]" including nursing staff, registered nurses, psychiatric security attendants, psychiatrists, psychologists, social workers, pharmacists, doctors, and "anybody that has a professional relationship with [R.D.]." 2 RP at 150. We conclude that an adequate foundation preceded admission of the chart notes.

C.      Hearsay within the Chart Notes

R.D. argues that the trial court erred in admitting the chart notes under the business records exception to the hearsay prohibition because they contained inadmissible hearsay.[2] Notably, R.D. does not argue that the records are *not* business records and therefore inadmissible, but appears to take issue with what he alleges is hearsay within the records, i.e. hearsay within hearsay.[3] We disagree with R.D.s argument.

1.      Legal Principles

A trial court's decision to admit business records is reviewed for a manifest abuse of discretion. *DeVries*, 149 Wn.2d at 847. The trial court's "'decision to admit or exclude business records . . . will not be reversed unless there has been a manifest abuse of discretion.'" *State v. Bajardi*, 3 Wn. App. 2d 726, 729, 418 P.3d 164 (2018) (quoting *State v. Ziegler*, 114 Wn.2d 533, 538, 789 P.2d 79 (1990)). "'Discretion is abused if it is exercised on untenable grounds or for untenable reasons.'" *Bajardi*, 3 Wn. App. 2d at 730 (quotation marks omitted) (quoting *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007)).

---

[2] The term "business records" refers to the hearsay exception found in ER 803(a)(6), entitled "records of regularly conducted activity," which in turn refers to chapter 5.45 RCW, the Uniform Business Records as Evidence Act.

[3] A careful review of R.D.'s brief reveals that he does not assign error to the trial court's finding that the chart notes were business records. Rather, he challenges the content of the records as containing inadmissible hearsay.

The Uniform Business Records as Evidence Act (UBRA), RCW 5.45.020, makes evidence that would otherwise be hearsay competent testimony. *Ziegler*, 114 Wn.2d at 537. The UBRA contemplates that business records are presumptively reliable if made in the regular course of business and with no apparent motive to falsify. *Id*. at 538. The UBRA provides:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

RCW 5.45.020.

"A practicing physician's records, made in the regular course of business, properly identified and otherwise relevant, constitute competent evidence of a condition therein recorded." *State v. Sellers*, 39 Wn. App. 799, 806, 695 P.2d 1014 (1985).

### 2. Chart Notes and Contents Thereof.

It is not disputed that the statements by the writer of the chart notes acting as declarant fell into the business record category and therefore fit the exception at ER 803(a)(6) to the general prohibition against hearsay. But R.D. appears to challenge the statements by other declarants besides the writer, who nevertheless recorded those statements by others. However, R.D. does not identify in his brief what content he is referring to that constitutes inadmissible hearsay in these business records. Therefore, we cannot address this claim. *See Rhinevault v. Rhinevault*, 91 Wn. App. 688, 692, 959 P.2d 687 (1998) ("the appellant bears the burden of complying with the Rules of Appellate Procedure ("RAP"). . . . The court may decline to reach the merits of an issue if this burden is not met."). We are not required to scour the record and identify which utterances or conduct qualify as statements, amount to non-hearsay, or are otherwise subject to hearsay exceptions. *See Mills v. Park*, 67 Wn.2d 717, 721, 409 P.2d 646 (1966).

11

II.      SUBSTANTIAL EVIDENCE FOR INVOLUNTARY COMMITMENT

R.D. argues that the State failed to prove that he is gravely disabled or presents a likelihood of serious harm as the result of a mental disorder.  We disagree.

A.      Legal Principles

We review a jury verdict for substantial evidence.  *Gorman v. Pierce County*, 176 Wn. App. 63, 87, 307 P.3d 795 (2013).  Substantial evidence is evidence "sufficient to persuade a rational, fair-minded person that the finding is true."  *Cantu v. Dep't of Lab. & Indus.*, 168 Wn. App. 14, 21, 277 P.3d 685 (2012).  When reviewing a jury verdict for substantial evidence, we view the evidence in the light most favorable to the nonmoving party.  *McCoy v. Kent Nursery, Inc.*, 163 Wn. App. 744, 769, 260 P.3d 967 (2011).  The burden is on the challenging party to demonstrate that substantial evidence does not support a finding of fact.  *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019).

The burden of proof at 90- or 180–day involuntary commitment proceedings is by clear, cogent, and convincing evidence, which means the ultimate fact in issue must be shown by evidence to be highly probable.  *In re the Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).  Findings must be supported by substantial evidence in light of the 'highly probable' test, meaning the ultimate fact at issue must be shown by evidence to be highly probable.  *In re Det. of A.M.*, 17 Wn. App. 2d 321, 331, 487 P.3d 531 (2021).  Furthermore, the evidence is considered in the light most favorable to the petitioners.  *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).  Accordingly, the jury's verdict should not be disturbed unless it is clearly unsupported by substantial evidence.  *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994).

Generally, persons may be involuntarily committed for treatment of mental disorders if, as a result of such disorders, they either (1) pose a substantial risk of harm to themselves, others, or

the property of others, or (2) are gravely disabled. RCW 71.05.280; *LaBelle*, 107 Wn.2d at 202.

"At the expiration of the fourteen-day period of intensive treatment, a person may be committed

for further treatment pursuant to RCW 71.05.320 if: . . . (4) Such person is gravely disabled."

RCW 71.05.280. "Gravely disabled" is defined as:

> a condition in which a person, as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(24).

Under this definition there are two alternative definitions of gravely disabled, either of

which provides a basis for involuntary commitment. *LaBelle*, 107 Wn.2d at 202. Those two

alternatives are prong (a), failure to meet essential needs; and prong (b), deterioration in routine

functioning. RCW 71.05.020(24). R.D. only argues a lack of evidence establishing prong (a).

> B. Sufficient Evidence Supports the Verdict that R.D. is Gravely Disabled Under Prong (a)

To establish "grave disability" under prong (a), the evidence must show a "failure or

inability to provide for such essential human needs as food, clothing, shelter, and medical

treatment." *LaBelle*, 107 Wn.2d at 204-05. Prong (a) also requires establishing that the failure to

meet these needs placed R.D. "in danger of serious physical harm." RCW 71.05.020(24); *see*

*A.M.*, 17 Wn. App. 2d at 334. Taken together, the requirement under (a) is evidence of both a

failure to provide for basic needs, but also that the failure was or could be harmful. *AM*, 17 Wn.

App. 2d at 335.

In *LaBelle*, the Supreme Court addressed several involuntary commitments under prong

(a). One of the appellants, Richardson, had a history of "not eating well before he was

13

hospitalized." *LaBelle*, 107 Wn.2d at 214. The court determined that the continued commitment was not supported by the evidence in part because "there was no evidence that he was in any danger" from "not eating well." *Id.* The court held that "[u]nder these circumstances, the risk of physical harm from Richardson's tendency to neglect his health was too speculative and insubstantial to justify continued commitment" under prong (a). *Id.* In contrast, the court held that there was sufficient evidence to support another appellant's commitment because there was evidence that the appellant, Trueblood, was not eating and that he "was noticeably losing weight." *Id.* These determinations by the court demonstrate that to establish grave disability under prong (a), there needs to be evidence not only of a failure to provide for nutritional needs but also that this deficiency was or could be harmful to the appellant. *AM*, 17 Wn. App. 2d at 334-35.

Here, R.D. argues that the court found grave disability under prong (a) without clear and convincing evidence, because there was no testimony that R.D. could not take care of his basic needs, just a concern for the possibility that he could not. However, the testimony shows a repeated refusal to interact with his treatment team and a denial that he suffers from a mental disorder. Both Dr. McBride and Dr. Karnik testified that R.D. reacts with anger and hostility to routine medical follow ups. The testifying doctors each concluded that R.D. would be in danger of failing to meet his basic safety needs if he were released into the community because of this consistent refusal, which they opine to be a result of a behavioral health disorder. Without the structure and support of the hospital, the doctors have a concern for R.D.'s ability to address his basic needs that could lead to serious physical harm.

In his brief, R.D. largely relies on *A.M.*, 17 Wn. App. 2d 321. In that case, we found that the petitioner was not gravely disabled under prong (a) of the definition based on his reluctance to eat. *Id.* at 335. The court reasoned that although there was sufficient evidence to establish an

inability to meet essential human needs, sufficient evidence did not establish that the petitioner's reluctance to eat was or could be harmful to him. *Id*. at 334-35. However, this case is not instructive, because R.D.'s alleged failure to meet his essential human needs is related to his reluctance to seek proper treatment for his mental illness, and is not related to his eating habits. In contrast to *AM*, the concern for R.D. is related to meeting his basic safety needs because of his refusal to interact with his treatment team, his denial that he has mental health issues, and his aggressive and hostile reactions to normal situations. Both doctors who testified for the State firmly stated that R.D. does not understand his diagnosis, which renders him unable to seek out resources, have relationships with others, or act in a manner that is safe. This testimony sufficiently establishes that the severity of symptoms in combination with a refusal to seek treatment makes R.D. unable to meet his essential human needs of health or safety.

The evidence presented shows that there is sufficient evidence to support R.D.'s commitment under prong (a), because he has consistently shown a hostile unwillingness to seek proper treatment. The harm R.D. presents is more than merely speculative, because of this continued and repeated pattern, as well as the hostile behaviors he exhibits without treatment. We conclude that the jury's conclusion that R.D's failure to meet his needs is supported by sufficient evidence.

D. Sufficient Evidence Supports the Verdict that R.D. Presents a Likelihood of Serious Harm

R.D. argues that the acts described in the State's evidence do not establish a risk that R.D. presents a likelihood of serious harm. We disagree.

A person may be involuntarily committed for further treatment after fourteen days of intensive treatment if

[s]uch person after having been taken into custody for evaluation and treatment has threatened, attempted, or inflicted: (a) Physical harm upon the person of another or himself or herself, or substantial damage upon the property of another, and (b) as a result of a behavioral health disorder presents a likelihood of serious harm.

RCW 71.05.280(1). A mental disorder is "any organic, mental, or emotional impairment that has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(38). "Likelihood of serious harm" is defined as:

(a) A substantial risk that: (i) Physical harm will be inflicted by a person upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself; (ii) physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (iii) physical harm will be inflicted by a person upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others; or
(b) The person has threatened the physical safety of another and has a history of one or more violent acts.

RCW 71.05.020(36).

RCW 71.05.020 has been interpreted as requiring a showing of a substantial risk of physical harm as evidenced by a recent overt act. "'This act may be one which has caused harm or creates a reasonable apprehension of dangerousness.'" *T.C.*, 11 Wn. App. 2d at 57 (quoting *In re Det. of Harris*, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982)).

Here, R.D. argues that the acts cited to in the record do not rise to the level of creating a serious threat of harm. R.D. asserts that one of the *LaBelle* respondents was found to pose a serious risk of harm to others because he had violently assaulted someone before his commitment. *LaBelle*, 107 Wn.2d at 212. R.D. distinguishes his circumstances from those of the *LaBelle* respondent in that R.D. did not similarly assault someone, so could not have been found to be a serious risk of harm to others. But *LaBelle* does not require a violent assault to show a likelihood of harm to others; more to the point the *LaBelle* court did not fully address the serious risk of harm

aspect of RCW 71.05.020(36). Instead, the *LaBelle* court determined that "the State presented substantial evidence of grave disability under RCW 71.05.020(1)(b)," it noted that delving into a "likelihood of harm to others" was not necessary. 107 Wn.2d at 213. The court merely mentioned that Marshall's overall hostile and reactive behavior which led to his arrest for assault *could be* a justification for "commitment based on the 'likelihood of serious harm to others' standard of RCW 71.05.280(1)(b)." *LaBelle*, Wn.2d at 212. R.D.'s argument fails.

RCW 71.05.020(36)(b) indicates that the only requirement is that "[t]he person has threatened the physical safety of another and has a history of one or more violent acts." There is substantial evidence in this case to support that R.D. has threatened the physical safety of another and has a history of violent acts. Dr. Karnik testified that R.D. "presents a danger," "is impulsive," and "has shown that he can be aggressive." 1 RP at 16. The exhibits presented at trial demonstrate that he punched a window, threatened to fight another patient, kicked a plastic chair for not being able to use the karaoke machine, and "creates a dangerous atmosphere for peers and staff." Ex. 4. The inpatient progress notes indicate that R.D. has exhibited numerous instances of verbal and physical aggression toward others since his admission to the hospital, and has at times required placement in seclusion or restraints. Furthermore, his doctors note that his diagnosis impacts perception, reasoning, insight, judgment, ability to meet health and safety needs, and ability to regulate emotions and behaviors.

Sufficient evidence supports the verdict that R.D. presents a likelihood of serious harm.

## CONCLUSION

The trial properly admitted the chart notes and the content thereof. Additionally, the evidence presented is sufficient to support the jury's verdict that R.D. is gravely disabled and presents a likelihood of serious harm. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Cruser, A.C.J.

Price, J.